(Slip Opinion) OCTOBER TERM, 2011 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ARIZONA ET AL. *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 11–182.   Argued April 25, 2012—Decided June 25, 2012

An Arizona statute known as S. B. 1070 was enacted in 2010 to address pressing issues related to the large number of unlawful aliens in the State.  The United States sought to enjoin the law as preempted.  The District Court issued a preliminary injunction preventing four of its provisions from taking effect.  Section 3 makes failure to comply with federal alien-registration requirements a state misdemeanor; §5(C) makes it a misdemeanor for an unauthorized alien to seek or engage in work in the State; §6 authorizes state and local officers to arrest without a warrant a person "the officer has probable cause to believe . . . has committed any public offense that makes the person removable from the United States"; and §2(B) requires officers conducting a stop, detention, or arrest to make efforts, in some circumstances, to verify the person's immigration status with the Federal Government. The Ninth Circuit affirmed, agreeing that the United States had established a likelihood of success on its preemption claims.

*Held*:

   1. The Federal Government's broad, undoubted power over immigration and alien status rests, in part, on its constitutional power to "establish an uniform Rule of Naturalization," Art. I, §8, cl. 4, and on its inherent sovereign power to control and conduct foreign relations, see *Toll* v. *Moreno*, 458 U. S. 1, 10.  Federal governance is extensive and complex.  Among other things, federal law specifies categories of aliens who are ineligible to be admitted to the United States, 8 U. S. C. §1182; requires aliens to register with the Federal Government and to carry proof of status, §§1304(e), 1306(a); imposes sanctions on employers who hire unauthorized workers, §1324a; and specifies which aliens may be removed and the procedures for doing so, see §1227.  Removal is a civil matter, and one of its principal features

is the broad discretion exercised by immigration officials, who must decide whether to pursue removal at all. Immigration and Customs Enforcement (ICE), an agency within the Department of Homeland Security, is responsible for identifying, apprehending, and removing illegal aliens. It also operates the Law Enforcement Support Center, which provides immigration status information to federal, state, and local officials around the clock. Pp. 2–7.

2. The Supremacy Clause gives Congress the power to preempt state law. A statute may contain an express preemption provision, see, *e.g., Chamber of Commerce of United States of America* v. *Whiting*, 563 U. S. ___, ___, but state law must also give way to federal law in at least two other circumstances. First, States are precluded from regulating conduct in a field that Congress has determined must be regulated by its exclusive governance. See *Gade* v. *National Solid Wastes Management Assn.,* 505 U. S. 88, 115. Intent can be inferred from a framework of regulation "so pervasive . . . that Congress left no room for the States to supplement it" or where a "federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230. Second, state laws are preempted when they conflict with federal law, including when they stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U. S. 52, 67. Pp. 7–8.

3. Sections 3, 5(C), and 6 of S. B. 1070 are preempted by federal law. Pp. 8–19.

(a) Section 3 intrudes on the field of alien registration, a field in which Congress has left no room for States to regulate. In *Hines,* a state alien-registration program was struck down on the ground that Congress intended its "complete" federal registration plan to be a "single integrated and all-embracing system." 312 U. S., at 74. That scheme did not allow the States to "curtail or complement" federal law or "enforce additional or auxiliary regulations." *Id.*, at 66–67. The federal registration framework remains comprehensive. Because Congress has occupied the field, even complementary state regulation is impermissible. Pp. 8–11.

(b) Section 5(C)'s criminal penalty stands as an obstacle to the federal regulatory system. The Immigration Reform and Control Act of 1986 (IRCA), a comprehensive framework for "combating the employment of illegal aliens," *Hoffman Plastic Compounds, Inc.* v. *NLRB*, 535 U. S. 137, 147, makes it illegal for employers to knowingly hire, recruit, refer, or continue to employ unauthorized workers, 8 U. S. C. §§1324a(a)(1)(A), (a)(2), and requires employers to verify prospective employees' employment authorization status,

§§1324a(a)(1)(B), (b). It imposes criminal and civil penalties on employers, §§1324a(e)(4), (f), but only civil penalties on aliens who seek, or engage in, unauthorized employment, *e.g.*, §§1255(c)(2), (c)(8). IRCA's express preemption provision, though silent about whether additional penalties may be imposed against employees, "does *not* bar the ordinary working of conflict pre-emption principles" or impose a "special burden" making it more difficult to establish the preemption of laws falling outside the clause. *Geier* v. *American Honda Motor Co.*, 529 U. S. 861, 869–872. The correct instruction to draw from the text, structure, and history of IRCA is that Congress decided it would be inappropriate to impose criminal penalties on unauthorized employees. It follows that a state law to the contrary is an obstacle to the regulatory system Congress chose. Pp. 12–15.

(c) By authorizing state and local officers to make warrantless arrests of certain aliens suspected of being removable, §6 too creates an obstacle to federal law. As a general rule, it is not a crime for a removable alien to remain in the United States. The federal scheme instructs when it is appropriate to arrest an alien during the removal process. The Attorney General in some circumstances will issue a warrant for trained federal immigration officers to execute. If no federal warrant has been issued, these officers have more limited authority. They may arrest an alien for being "in the United States in violation of any [immigration] law or regulation," for example, but only where the alien "is likely to escape before a warrant can be obtained." §1357(a)(2). Section 6 attempts to provide state officers with even greater arrest authority, which they could exercise with no instruction from the Federal Government. This is not the system Congress created. Federal law specifies limited circumstances in which state officers may perform an immigration officer's functions. This includes instances where the Attorney General has granted that authority in a formal agreement with a state or local government. See, *e.g.*, §1357(g)(1). Although federal law permits state officers to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," §1357(g)(10)(B), this does not encompass the unilateral decision to detain authorized by §6. Pp. 15–19.

4. It was improper to enjoin §2(B) before the state courts had an opportunity to construe it and without some showing that §2(B)'s enforcement in fact conflicts with federal immigration law and its objectives. Pp. 19–24.

(a) The state provision has three limitations: A detainee is presumed not to be an illegal alien if he or she provides a valid Arizona driver's license or similar identification; officers may not consider race, color, or national origin "except to the extent permitted by the

United States [and] Arizona Constitution[s]"; and §2(B) must be "implemented in a manner consistent with federal law regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens." P. 20.

(b) This Court finds unpersuasive the argument that, even with those limits, §2(B) must be held preempted at this stage. Pp. 20–24.

(1) The mandatory nature of the status checks does not interfere with the federal immigration scheme. Consultation between federal and state officials is an important feature of the immigration system. In fact, Congress has encouraged the sharing of information about possible immigration violations. See §§1357(g)(10)(A), 1373(c). The federal scheme thus leaves room for a policy requiring state officials to contact ICE as a routine matter. Cf. *Whiting*, 563 U. S., at ___. Pp. 20–21.

(2) It is not clear at this stage and on this record that §2(B), in practice, will require state officers to delay the release of detainees for no reason other than to verify their immigration status. This would raise constitutional concerns. And it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision. But §2(B) could be read to avoid these concerns. If the law only requires state officers to conduct a status check during the course of an authorized, lawful detention or after a detainee has been released, the provision would likely survive preemption—at least absent some showing that it has other consequences that are adverse to federal law and its objectives. Without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume §2(B) will be construed in a way that conflicts with federal law. Cf. *Fox* v. *Washington*, 236 U. S. 273, 277. This opinion does not foreclose other preemption and constitutional challenges to the law as interpreted and applied after it goes into effect. Pp. 22–24.

641 F. 3d 339, affirmed in part, reversed in part, and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. SCALIA, J., THOMAS, J., and ALITO, J., filed opinions concurring in part and dissenting in part. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–182

ARIZONA, ET AL., PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2012]

JUSTICE KENNEDY delivered the opinion of the Court.

To address pressing issues related to the large number of aliens within its borders who do not have a lawful right to be in this country, the State of Arizona in 2010 enacted a statute called the Support Our Law Enforcement and Safe Neighborhoods Act. The law is often referred to as S. B. 1070, the version introduced in the state senate. See also H. 2162 (2010) (amending S. 1070). Its stated purpose is to "discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States." Note following Ariz. Rev. Stat. Ann. §11–1051 (West 2012). The law's provisions establish an official state policy of "attrition through enforcement." *Ibid.* The question before the Court is whether federal law preempts and renders invalid four separate provisions of the state law.

I

The United States filed this suit against Arizona, seeking to enjoin S. B. 1070 as preempted. Four provisions of the law are at issue here. Two create new state offenses. Section 3 makes failure to comply with federal alien-registration requirements a state misdemeanor. Ariz.

Rev. Stat. Ann. §13–1509 (West Supp. 2011). Section 5, in relevant part, makes it a misdemeanor for an unauthorized alien to seek or engage in work in the State; this provision is referred to as §5(C). See §13–2928(C). Two other provisions give specific arrest authority and investigative duties with respect to certain aliens to state and local law enforcement officers. Section 6 authorizes officers to arrest without a warrant a person "the officer has probable cause to believe . . . has committed any public offense that makes the person removable from the United States." §13–3883(A)(5). Section 2(B) provides that officers who conduct a stop, detention, or arrest must in some circumstances make efforts to verify the person's immigration status with the Federal Government. See §11–1051(B) (West 2012).

The United States District Court for the District of Arizona issued a preliminary injunction preventing the four provisions at issue from taking effect. 703 F. Supp. 2d 980, 1008 (2010). The Court of Appeals for the Ninth Circuit affirmed. 641 F. 3d 339, 366 (2011). It agreed that the United States had established a likelihood of success on its preemption claims. The Court of Appeals was unanimous in its conclusion that §§3 and 5(C) were likely preempted. Judge Bea dissented from the decision to uphold the preliminary injunction against §§2(B) and 6. This Court granted certiorari to resolve important questions concerning the interaction of state and federal power with respect to the law of immigration and alien status. 565 U. S. ___ (2011).

## II

### A

The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens. See *Toll* v. *Moreno*, 458 U. S. 1, 10 (1982); see generally S. Legomsky & C. Rodríguez, Immigration

and Refugee Law and Policy 115–132 (5th ed. 2009). This authority rests, in part, on the National Government's constitutional power to "establish an uniform Rule of Naturalization," U. S. Const., Art. I, §8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations, see *Toll, supra,* at 10 (citing *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304, 318 (1936)).

The federal power to determine immigration policy is well settled. Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws. See, *e.g.,* Brief for Argentina et al. as *Amici Curiae;* see also *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 588–589 (1952). Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad. See Brief for Madeleine K. Albright et al. as *Amici Curiae* 24–30.

It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States. See *Chy Lung* v. *Freeman*, 92 U. S. 275, 279–280 (1876); see also The Federalist No. 3, p. 39 (C. Rossiter ed. 2003) (J. Jay) (observing that federal power would be necessary in part because "bordering States . . . under the impulse of sudden irritation, and a quick sense of apparent interest or injury" might take action that would undermine foreign relations). This Court has reaffirmed that "[o]ne of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country." *Hines* v. *Davidowitz*, 312 U. S. 52, 64 (1941).

Federal governance of immigration and alien status is

extensive and complex. Congress has specified catego-
ries of aliens who may not be admitted to the United
States. See 8 U. S. C. §1182. Unlawful entry and unlawful
reentry into the country are federal offenses. §§1325,
1326. Once here, aliens are required to register with the
Federal Government and to carry proof of status on their
person. See §§1301–1306. Failure to do so is a federal
misdemeanor. §§1304(e), 1306(a). Federal law also au-
thorizes States to deny noncitizens a range of public bene-
fits, §1622; and it imposes sanctions on employers who
hire unauthorized workers, §1324a.

Congress has specified which aliens may be removed
from the United States and the procedures for doing so.
Aliens may be removed if they were inadmissible at the
time of entry, have been convicted of certain crimes, or
meet other criteria set by federal law. See §1227. Re-
moval is a civil, not criminal, matter. A principal feature of
the removal system is the broad discretion exercised by
immigration officials. See Brief for Former Commission-
ers of the United States Immigration and Naturalization
Service as *Amici Curiae* 8–13 (hereinafter Brief for For-
mer INS Commissioners). Federal officials, as an initial
matter, must decide whether it makes sense to pursue
removal at all. If removal proceedings commence, aliens
may seek asylum and other discretionary relief allowing
them to remain in the country or at least to leave without
formal removal. See §1229a(c)(4); see also, *e.g.,* §§1158
(asylum), 1229b (cancellation of removal), 1229c (volun-
tary departure).

Discretion in the enforcement of immigration law em-
braces immediate human concerns. Unauthorized work-
ers trying to support their families, for example, likely
pose less danger than alien smugglers or aliens who com-
mit a serious crime. The equities of an individual case
may turn on many factors, including whether the alien
has children born in the United States, long ties to the

community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations. Returning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission. The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return. The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.

Agencies in the Department of Homeland Security play a major role in enforcing the country's immigration laws. United States Customs and Border Protection (CBP) is responsible for determining the admissibility of aliens and securing the country's borders. See Dept. of Homeland Security, Office of Immigration Statistics, Immigration Enforcement Actions: 2010, p. 1 (2011). In 2010, CBP's Border Patrol apprehended almost half a million people. *Id.*, at 3. Immigration and Customs Enforcement (ICE), a second agency, "conducts criminal investigations involving the enforcement of immigration-related statutes." *Id.*, at 2. ICE also operates the Law Enforcement Support Center. LESC, as the Center is known, provides immigration status information to federal, state, and local officials around the clock. See App. 91. ICE officers are responsible "for the identification, apprehension, and removal of illegal aliens from the United States." Immigration Enforcement Actions, *supra,* at 2. Hundreds of thousands of aliens are removed by the Federal Government every year. See *id.,* at 4 (reporting there were 387,242 removals, and 476,405 returns without a removal order, in 2010).

B

The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States. Arizona bears many of the consequences of unlawful immigration. Hundreds of thousands of deportable aliens are apprehended in Arizona each year. Dept. of Homeland Security, Office of Immigration Statistics, 2010 Yearbook of Immigration Statistics 93 (2011) (Table 35). Unauthorized aliens who remain in the State comprise, by one estimate, almost six percent of the population. See Passel & Cohn, Pew Hispanic Center, U. S. Unauthorized Immigration Flows Are Down Sharply Since Mid-Decade 3 (2010). And in the State's most populous county, these aliens are reported to be responsible for a disproportionate share of serious crime. See, *e.g.,* Camarota & Vaughan, Center for Immigration Studies, Immigration and Crime: Assessing a Conflicted Situation 16 (2009) (Table 3) (estimating that unauthorized aliens comprise 8.9% of the population and are responsible for 21.8% of the felonies in Maricopa County, which includes Phoenix).

Statistics alone do not capture the full extent of Arizona's concerns. Accounts in the record suggest there is an "epidemic of crime, safety risks, serious property damage, and environmental problems" associated with the influx of illegal migration across private land near the Mexican border. Brief for Petitioners 6. Phoenix is a major city of the United States, yet signs along an interstate highway 30 miles to the south warn the public to stay away. One reads, "DANGER—PUBLIC WARNING—TRAVEL NOT RECOMMENDED / Active Drug and Human Smuggling Area / Visitors May Encounter Armed Criminals and Smuggling Vehicles Traveling at High Rates of Speed." App. 170; see also Brief for Petitioners 5–6. The problems posed to the State by illegal immigration must not be underestimated.

These concerns are the background for the formal legal

analysis that follows. The issue is whether, under preemption principles, federal law permits Arizona to implement the state-law provisions in dispute.

## III

Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect. See *Gregory* v. *Ashcroft*, 501 U. S. 452, 457 (1991); *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 838 (1995) (KENNEDY, J., concurring). From the existence of two sovereigns follows the possibility that laws can be in conflict or at cross-purposes. The Supremacy Clause provides a clear rule that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. Under this principle, Congress has the power to preempt state law. See *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 372 (2000); *Gibbons* v. *Ogden*, 9 Wheat. 1, 210–211 (1824). There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision. See, *e.g., Chamber of Commerce of United States of America* v. *Whiting*, 563 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 4).

State law must also give way to federal law in at least two other circumstances. First, the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance. See *Gade* v. *National Solid Wastes Management Assn.,* 505 U. S. 88, 115 (1992). The intent to displace state law altogether can be inferred from a framework of regulation "so pervasive . . . that Congress left no room for the States to supplement it" or where there is a "federal interest . . . so dominant that the

federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947); see *English* v. *General Elec. Co.*, 496 U. S. 72, 79 (1990).

Second, state laws are preempted when they conflict with federal law. *Crosby, supra,* at 372. This includes cases where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), and those instances where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U. S., at 67; see also *Crosby, supra*, at 373 ("What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects"). In preemption analysis, courts should assume that "the historic police powers of the States" are not superseded "unless that was the clear and manifest purpose of Congress." *Rice, supra,* at 230; see *Wyeth* v. *Levine*, 555 U. S. 555, 565 (2009).

The four challenged provisions of the state law each must be examined under these preemption principles.

## IV

### A

#### *Section 3*

Section 3 of S. B. 1070 creates a new state misdemeanor. It forbids the "willful failure to complete or carry an alien registration document . . . in violation of 8 United States Code section 1304(e) or 1306(a)." Ariz. Rev. Stat. Ann. §11–1509(A) (West Supp. 2011). In effect, §3 adds a state-law penalty for conduct proscribed by federal law. The United States contends that this state enforcement mechanism intrudes on the field of alien registration, a field in which Congress has left no room for States to

regulate. See Brief for United States 27, 31.

The Court discussed federal alien-registration require-ments in *Hines* v. *Davidowitz*, 312 U. S. 52. In 1940, as international conflict spread, Congress added to federal immigration law a "complete system for alien registra-tion." *Id.*, at 70. The new federal law struck a careful balance. It punished an alien's willful failure to register but did not require aliens to carry identification cards. There were also limits on the sharing of registration rec-ords and fingerprints. The Court found that Congress intended the federal plan for registration to be a "single integrated and all-embracing system." *Id.*, at 74. Because this "complete scheme . . . for the registration of aliens" touched on foreign relations, it did not allow the States to "curtail or complement" federal law or to "enforce addi-tional or auxiliary regulations." *Id.*, at 66–67. As a con-sequence, the Court ruled that Pennsylvania could not enforce its own alien-registration program. See *id.*, at 59, 74.

The present regime of federal regulation is not identi-cal to the statutory framework considered in *Hines*, but it remains comprehensive. Federal law now includes a requirement that aliens carry proof of registration. 8 U. S. C. §1304(e). Other aspects, however, have stayed the same. Aliens who remain in the country for more than 30 days must apply for registration and be fingerprinted. Compare §1302(a) with *id.*, §452(a) (1940 ed.). Detailed information is required, and any change of address has to be reported to the Federal Government. Compare §§1304(a), 1305(a) (2006 ed.), with *id.*, §§455(a), 456 (1940 ed.). The statute continues to provide penalties for the willful failure to register. Compare §1306(a) (2006 ed.), with *id.*, §457 (1940 ed.).

The framework enacted by Congress leads to the conclu-sion here, as it did in *Hines*, that the Federal Government has occupied the field of alien registration. See *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396, 419, n. 11 (2003)

(characterizing *Hines* as a field preemption case); *Pennsylvania* v. *Nelson*, 350 U. S. 497, 504 (1956) (same); see also Dinh, Reassessing the Law of Preemption, 88 Geo. L. J. 2085, 2098–2099, 2107 (2000) (same). The federal statutory directives provide a full set of standards governing alien registration, including the punishment for noncompliance. It was designed as a "'harmonious whole.'" *Hines*, *supra,* at 72. Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards. See *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 249 (1984).

Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders. If §3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations, "diminish[ing] the [Federal Government]'s control over enforcement" and "detract[ing] from the 'integrated scheme of regulation' created by Congress." *Wisconsin Dept. of Industry* v. *Gould Inc.*, 475 U. S. 282, 288–289 (1986). Even if a State may make violation of federal law a crime in some instances, it cannot do so in a field (like the field of alien registration) that has been occupied by federal law. See *California* v. *Zook*, 336 U. S. 725, 730–731, 733 (1949); see also *In re Loney*, 134 U. S. 372, 375–376 (1890) (States may not impose their own punishment for perjury in federal courts).

Arizona contends that §3 can survive preemption because the provision has the same aim as federal law and adopts its substantive standards. This argument not only ignores the basic premise of field preemption—that States may not enter, in any respect, an area the Federal Government has reserved for itself—but also is unpersuasive

on its own terms. Permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted. Cf. *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U. S. 341, 347–348 (2001) (States may not impose their own punishment for fraud on the Food and Drug Administration); *Wisconsin Dept., supra,* at 288 (States may not impose their own punishment for repeat violations of the National Labor Relations Act). Were §3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies.

There is a further intrusion upon the federal scheme. Even where federal authorities believe prosecution is appropriate, there is an inconsistency between §3 and federal law with respect to penalties. Under federal law, the failure to carry registration papers is a misdemeanor that may be punished by a fine, imprisonment, or a term of probation. See 8 U. S. C. §1304(e) (2006 ed.); 18 U. S. C. §3561. State law, by contrast, rules out probation as a possible sentence (and also eliminates the possibility of a pardon). See Ariz. Rev. Stat. Ann. §13–1509(D) (West Supp. 2011). This state framework of sanctions creates a conflict with the plan Congress put in place. See *Wisconsin Dept., supra,* at 286 ("[C]onflict is imminent whenever two separate remedies are brought to bear on the same activity" (internal quotation marks omitted)).

These specific conflicts between state and federal law simply underscore the reason for field preemption. As it did in *Hines*, the Court now concludes that, with respect to the subject of alien registration, Congress intended to preclude States from "complement[ing] the federal law, or enforc[ing] additional or auxiliary regulations." 312 U. S., at 66–67. Section 3 is preempted by federal law.

B

*Section 5(C)*

Unlike §3, which replicates federal statutory require-ments, §5(C) enacts a state criminal prohibition where no federal counterpart exists.  The provision makes it a state misdemeanor for "an unauthorized alien to knowingly ap-ply for work, solicit work in a public place or perform work as an employee or independent contractor" in Ari-zona.  Ariz. Rev. Stat. Ann. §13–2928(C) (West Supp. 2011).  Violations can be punished by a $2,500 fine and incarcera-tion for up to six months.  See §13–2928(F); see also §§13–707(A)(1) (West 2010); 13–802(A); 13–902(A)(5).  The United States contends that the provision upsets the bal-ance struck by the Immigration Reform and Control Act of 1986 (IRCA) and must be preempted as an obstacle to the federal plan of regulation and control.

When there was no comprehensive federal program regulating the employment of unauthorized aliens, this Court found that a State had authority to pass its own laws on the subject.  In 1971, for example, California passed a law imposing civil penalties on the employment of aliens who were "not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers."  1971 Cal. Stats. ch. 1442, §1(a).  The law was upheld against a preemption challenge in *De Canas* v. *Bica*, 424 U. S. 351 (1976).  *De Canas* recognized that "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State."  *Id.,* at 356.  At that point, however, the Federal Government had expressed no more than "a peripheral concern with [the] employment of illegal entrants."  *Id.*, at 360; see *Whiting*, 563 U. S., at ___ (slip op., at 3).

Current federal law is substantially different from the regime that prevailed when *De Canas* was decided.  Con-gress enacted IRCA as a comprehensive framework for

"combating the employment of illegal aliens."  *Hoffman Plastic Compounds, Inc.* v. *NLRB*, 535 U. S. 137, 147 (2002).  The law makes it illegal for employers to knowingly hire, recruit, refer, or continue to employ unauthorized workers.  See 8 U. S. C. §§1324a(a)(1)(A), (a)(2).  It also requires every employer to verify the employment authorization status of prospective employees.  See §§1324a(a) (1)(B), (b); 8 CFR §274a.2(b) (2012).  These requirements are enforced through criminal penalties and an escalating series of civil penalties tied to the number of times an employer has violated the provisions.  See 8 U. S. C. §§1324a(e)(4), (f); 8 CFR §274a.10.

This comprehensive framework does not impose federal criminal sanctions on the employee side (*i.e.,* penalties on aliens who seek or engage in unauthorized work).  Under federal law some civil penalties are imposed instead.  With certain exceptions, aliens who accept unlawful employment are not eligible to have their status adjusted to that of a lawful permanent resident.  See 8 U. S. C. §§1255(c)(2), (c)(8).  Aliens also may be removed from the country for having engaged in unauthorized work.  See §1227(a)(1)(C)(i); 8 CFR §214.1(e).  In addition to specifying these civil consequences, federal law makes it a crime for unauthorized workers to obtain employment through fraudulent means.  See 18 U. S. C. §1546(b).  Congress has made clear, however, that any information employees submit to indicate their work status "may not be used" for purposes other than prosecution under specified federal criminal statutes for fraud, perjury, and related conduct. See 8 U. S. C. §§1324a(b)(5), (d)(2)(F)–(G).

The legislative background of IRCA underscores the fact that Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment.  A commission established by Congress to study immigration policy and to make recommendations concluded these penalties would be "unnecessary

and unworkable."   U. S. Immigration Policy and the Na-
tional Interest: The Final Report and Recommendations of
the Select Commission on Immigration and Refugee Policy
with Supplemental Views by Commissioners 65–66 (1981);
see Pub. L. 95–412, §4, 92 Stat. 907.   Proposals to make
unauthorized work a criminal offense were debated and
discussed during the long process of drafting IRCA.   See
Brief for Service Employees International Union et al. as
*Amici Curiae* 9–12.   But Congress rejected them.   See, *e.g.,*
119 Cong. Rec. 14184 (1973) (statement of Rep. Dennis).
In the end, IRCA's framework reflects a considered judg-
ment that making criminals out of aliens engaged in
unauthorized work—aliens who already face the possibil-
ity of employer exploitation because of their removable
status—would be inconsistent with federal policy and ob-
jectives.   See, *e.g.,* Hearings before the Subcommittee
No. 1 of the House Committee on the Judiciary, 92d Cong.,
1st Sess., pt. 3, pp. 919–920 (1971) (statement of Rep.
Rodino, the eventual sponsor of IRCA in the House of
Representatives).

IRCA's express preemption provision, which in most
instances bars States from imposing penalties on employ-
ers of unauthorized aliens, is silent about whether addi-
tional penalties may be imposed against the employees
themselves.   See 8 U. S. C. §1324a(h)(2); *Whiting, supra,*
at ___–___ (slip op., at 1–2).   But the existence of an "ex-
press pre-emption provisio[n] does *not* bar the ordinary
working of conflict pre-emption principles" or impose a
"special burden" that would make it more difficult to
establish the preemption of laws falling outside the clause.
*Geier* v. *American Honda Motor Co.*, 529 U. S. 861, 869–
872 (2000); see *Sprietsma* v. *Mercury Marine*, 537 U. S. 51,
65 (2002).

The ordinary principles of preemption include the well-
settled proposition that a state law is preempted where it
"stands as an obstacle to the accomplishment and exe-

cution of the full purposes and objectives of Congress." *Hines*, 312 U. S., at 67. Under §5(C) of S. B. 1070, Arizona law would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens. Although §5(C) attempts to achieve one of the same goals as federal law—the deterrence of unlawful employment—it involves a conflict in the method of enforcement. The Court has recognized that a "[c]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy." *Motor Coach Employees* v. *Lockridge*, 403 U. S. 274, 287 (1971). The correct instruction to draw from the text, structure, and history of IRCA is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment. It follows that a state law to the contrary is an obstacle to the regulatory system Congress chose. See *Puerto Rico Dept. of Consumer Affairs* v. *ISLA Petroleum Corp.*, 485 U. S. 495, 503 (1988) ("Where a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, *then* the pre-emptive inference can be drawn—not from federal inaction alone, but from inaction joined with action"). Section 5(C) is preempted by federal law.

## C

### *Section 6*

Section 6 of S. B. 1070 provides that a state officer, "without a warrant, may arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States." Ariz. Rev. Stat. Ann. §13–3883(A)(5) (West Supp. 2011). The United States argues that arrests authorized by this statute would be an obstacle to the removal system Congress created.

As a general rule, it is not a crime for a removable alien to remain present in the United States. See *INS* v. *Lopez-*

*Mendoza*, 468 U. S. 1032, 1038 (1984). If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent. When an alien is suspected of being removable, a federal official issues an administrative document called a Notice to Appear. See 8 U. S. C. §1229(a); 8 CFR §239.1(a) (2012). The form does not authorize an arrest. Instead, it gives the alien information about the proceedings, including the time and date of the removal hearing. See 8 U. S. C. §1229(a)(1). If an alien fails to appear, an *in absentia* order may direct removal. §1229a(5)(A).

The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process. For example, the Attorney General can exercise discretion to issue a warrant for an alien's arrest and detention "pending a decision on whether the alien is to be removed from the United States." 8 U. S. C. §1226(a); see Memorandum from John Morton, Director, ICE, to All Field Office Directors et al., Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens (June 17, 2011) (hereinafter 2011 ICE Memorandum) (describing factors informing this and related decisions). And if an alien is ordered removed after a hearing, the Attorney General will issue a warrant. See 8 CFR §241.2(a)(1). In both instances, the warrants are executed by federal officers who have received training in the enforcement of immigration law. See §§241.2(b), 287.5(e)(3). If no federal warrant has been issued, those officers have more limited authority. See 8 U. S. C. §1357(a). They may arrest an alien for being "in the United States in violation of any [immigration] law or regulation," for example, but only where the alien "is likely to escape before a warrant can be obtained." §1357(a)(2).

Section 6 attempts to provide state officers even greater authority to arrest aliens on the basis of possible remova-

bility than Congress has given to trained federal immigration officers. Under state law, officers who believe an alien is removable by reason of some "public offense" would have the power to conduct an arrest on that basis regardless of whether a federal warrant has issued or the alien is likely to escape. This state authority could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case. This would allow the State to achieve its own immigration policy. The result could be unnecessary harassment of some aliens (for instance, a veteran, college student, or someone assisting with a criminal investigation) whom federal officials determine should not be removed.

This is not the system Congress created. Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer. A principal example is when the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government. See §1357(g)(1); see also §1103(a)(10) (authority may be extended in the event of an "imminent mass influx of aliens off the coast of the United States"); §1252c (authority to arrest in specific circumstance after consultation with the Federal Government); §1324(c) (authority to arrest for bringing in and harboring certain aliens). Officers covered by these agreements are subject to the Attorney General's direction and supervision. §1357(g)(3). There are significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable. See *Padilla* v. *Kentucky*, 559 U. S. \_\_\_, \_\_\_–\_\_\_ (2010) (ALITO, J., concurring in judgment) (slip op., at 4–7). As a result, the agreements reached with the Attorney General must contain written certification that officers have received adequate training to carry out the duties of an immigration officer. See §1357(g)(2); cf. 8 CFR §§287.5(c) (arrest power contingent on training), 287.1(g) (defining the

training).

By authorizing state officers to decide whether an alien should be detained for being removable, §6 violates the principle that the removal process is entrusted to the discretion of the Federal Government. See, *e.g., Reno* v. *American-Arab Anti-Discrimination Comm.,* 525 U. S. 471, 483–484 (1999); see also Brief for Former INS Commissioners 8–13. A decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice. See *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 348 (2005) ("Removal decisions, including the selection of a removed alien's destination, may implicate [the Nation's] relations with foreign powers and require consideration of changing political and economic circumstances" (internal quotation marks omitted)); see also *Galvan* v. *Press*, 347 U. S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . ."); *Truax* v. *Raich*, 239 U. S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government").

In defense of §6, Arizona notes a federal statute permitting state officers to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U. S. C. §1357(g)(10)(B). There may be some ambiguity as to what constitutes cooperation under the federal law; but no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government. The Department of Homeland Security gives examples of what would constitute cooperation under federal law. These include situations where States participate in a joint task force

with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities. See Dept. of Homeland Security, Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters 13–14 (2011), online at http://www.dhs.gov/files/resources/immigration.shtm (all Internet materials as visited June 21, 2012, and available in Clerk of Court's case file). State officials can also assist the Federal Government by responding to requests for information about when an alien will be released from their custody. See §1357(d). But the unilateral state action to detain authorized by §6 goes far beyond these measures, defeating any need for real cooperation.

Congress has put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific, limited circumstances. By nonetheless authorizing state and local officers to engage in these enforcement activities as a general matter, §6 creates an obstacle to the full purposes and objectives of Congress. See *Hines*, 312 U. S., at 67. Section 6 is preempted by federal law.

## D
### *Section 2(B)*

Section 2(B) of S. B. 1070 requires state officers to make a "reasonable attempt . . . to determine the immigration status" of any person they stop, detain, or arrest on some other legitimate basis if "reasonable suspicion exists that the person is an alien and is unlawfully present in the United States." Ariz. Rev. Stat. Ann. §11–1051(B) (West 2012). The law also provides that "[a]ny person who is arrested shall have the person's immigration status determined before the person is released." *Ibid.* The accepted way to perform these status checks is to contact ICE, which maintains a database of immigration records.

Three limits are built into the state provision.  First, a detainee is presumed not to be an alien unlawfully present in the United States if he or she provides a valid Arizona driver's license or similar identification.  Second, officers "may not consider race, color or national origin . . . except to the extent permitted by the United States [and] Arizona Constitution[s]."  *Ibid.*  Third, the provisions must be "implemented in a manner consistent with federal law regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens."  §11–1051(L) (West 2012).

The United States and its *amici* contend that, even with these limits, the State's verification requirements pose an obstacle to the framework Congress put in place.  The first concern is the mandatory nature of the status checks.  The second is the possibility of prolonged detention while the checks are being performed.

1

Consultation between federal and state officials is an important feature of the immigration system.  Congress has made clear that no formal agreement or special training needs to be in place for state officers to "communicate with the [Federal Government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States."  8 U. S. C. §1357(g)(10)(A).  And Congress has obligated ICE to respond to any request made by state officials for verification of a person's citizenship or immigration status.  See §1373(c); see also §1226(d)(1)(A) (requiring a system for determining whether individuals arrested for aggravated felonies are aliens).  ICE's Law Enforcement Support Center operates "24 hours a day, seven days a week, 365 days a year" and provides, among other things, "immigration status, identity information and real-time assistance to local, state and federal law

enforcement agencies." ICE, Fact Sheet: Law Enforcement Support Center (May 29, 2012), online at http://www.ice.gov/news/library/factsheets/lesc.htm. LESC responded to more than one million requests for information in 2009 alone. App. 93.

The United States argues that making status verification mandatory interferes with the federal immigration scheme. It is true that §2(B) does not allow state officers to consider federal enforcement priorities in deciding whether to contact ICE about someone they have detained. See Brief for United States 47–50. In other words, the officers must make an inquiry even in cases where it seems unlikely that the Attorney General would have the alien removed. This might be the case, for example, when an alien is an elderly veteran with significant and longstanding ties to the community. See 2011 ICE Memorandum 4–5 (mentioning these factors as relevant).

Congress has done nothing to suggest it is inappropriate to communicate with ICE in these situations, however. Indeed, it has encouraged the sharing of information about possible immigration violations. See 8 U. S. C. §1357(g)(10)(A). A federal statute regulating the public benefits provided to qualified aliens in fact instructs that "no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [ICE] information regarding the immigration status, lawful or unlawful, of an alien in the United States." §1644. The federal scheme thus leaves room for a policy requiring state officials to contact ICE as a routine matter. Cf. *Whiting*, 563 U. S., at ___–___ (slip op., at 23–24) (rejecting argument that federal law preempted Arizona's requirement that employers determine whether employees were eligible to work through the federal E-Verify system where the Federal Government had encouraged its use).

2

Some who support the challenge to §2(B) argue that, in practice, state officers will be required to delay the release of some detainees for no reason other than to verify their immigration status. See, *e.g.,* Brief for Former Arizona Attorney General Terry Goddard et al. as *Amici Curiae* 37, n. 49. Detaining individuals solely to verify their immigration status would raise constitutional concerns. See, *e.g., Arizona* v. *Johnson*, 555 U. S. 323, 333 (2009); *Illinois* v. *Caballes*, 543 U. S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission"). And it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision. Cf. Part IV–C, *supra* (concluding that Arizona may not authorize warrantless arrests on the basis of removability). The program put in place by Congress does not allow state or local officers to adopt this enforcement mechanism.

But §2(B) could be read to avoid these concerns. To take one example, a person might be stopped for jaywalking in Tucson and be unable to produce identification. The first sentence of §2(B) instructs officers to make a "reasonable" attempt to verify his immigration status with ICE if there is reasonable suspicion that his presence in the United States is unlawful. The state courts may conclude that, unless the person continues to be suspected of some crime for which he may be detained by state officers, it would not be reasonable to prolong the stop for the immigration inquiry. See Reply Brief for Petitioners 12, n. 4 ("[Section 2(B)] does not require the verification be completed during the stop or detention if that is not reasonable or practicable"); cf. *Muehler* v. *Mena*, 544 U. S. 93, 101 (2005) (finding no Fourth Amendment violation where questioning about

immigration status did not prolong a stop).

To take another example, a person might be held pending release on a charge of driving under the influence of alcohol. As this goes beyond a mere stop, the arrestee (unlike the jaywalker) would appear to be subject to the categorical requirement in the second sentence of §2(B) that "[a]ny person who is arrested shall have the person's immigration status determined before [he] is released." State courts may read this as an instruction to initiate a status check every time someone is arrested, or in some subset of those cases, rather than as a command to hold the person until the check is complete no matter the circumstances. Even if the law is read as an instruction to complete a check while the person is in custody, moreover, it is not clear at this stage and on this record that the verification process would result in prolonged detention.

However the law is interpreted, if §2(B) only requires state officers to conduct a status check during the course of an authorized, lawful detention or after a detainee has been released, the provision likely would survive preemption—at least absent some showing that it has other consequences that are adverse to federal law and its objectives. There is no need in this case to address whether reasonable suspicion of illegal entry or another immigration crime would be a legitimate basis for prolonging a detention, or whether this too would be preempted by federal law. See, *e.g., United States* v. *Di Re*, 332 U. S. 581, 589 (1948) (authority of state officers to make arrests for federal crimes is, absent federal statutory instruction, a matter of state law); *Gonzales* v. *Peoria*, 722 F. 2d 468, 475–476 (CA9 1983) (concluding that Arizona officers have authority to enforce the criminal provisions of federal immigration law), overruled on other grounds in *Hodgers-Durgin* v. *de la Vina*, 199 F. 3d 1037 (CA9 1999).

The nature and timing of this case counsel caution in evaluating the validity of §2(B). The Federal Government

has brought suit against a sovereign State to challenge the provision even before the law has gone into effect. There is a basic uncertainty about what the law means and how it will be enforced. At this stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume §2(B) will be construed in a way that creates a conflict with federal law. Cf. *Fox* v. *Washington*, 236 U. S. 273, 277 (1915) ("So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed; and it is to be presumed that state laws will be construed in that way by the state courts" (citation omitted)). As a result, the United States cannot prevail in its current challenge. See *Huron Portland Cement Co.* v. *Detroit*, 362 U. S. 440, 446 (1960) ("To hold otherwise would be to ignore the teaching of this Court's decisions which enjoin seeking out conflicts between state and federal regulation where none clearly exists"). This opinion does not foreclose other preemption and constitutional challenges to the law as interpreted and applied after it goes into effect.

V

Immigration policy shapes the destiny of the Nation. On May 24, 2012, at one of this Nation's most distinguished museums of history, a dozen immigrants stood before the tattered flag that inspired Francis Scott Key to write the National Anthem. There they took the oath to become American citizens. The Smithsonian, News Release, Smithsonian Citizenship Ceremony Welcomes a Dozen New Americans (May 24, 2012), online at http://newsdesk.si.edu/releases. These naturalization ceremonies bring together men and women of different origins who now share a common destiny. They swear a common oath to renounce fidelity to foreign princes, to defend the Constitution, and to bear arms on behalf of the country when required by law. 8 CFR §337.1(a) (2012).

The history of the United States is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here.

The National Government has significant power to regulate immigration. With power comes responsibility, and the sound exercise of national power over immigration depends on the Nation's meeting its responsibility to base its laws on a political will informed by searching, thoughtful, rational civic discourse. Arizona may have understandable frustrations with the problems caused by illegal immigration while that process continues, but the State may not pursue policies that undermine federal law.

\*    \*    \*

The United States has established that §§3, 5(C), and 6 of S. B. 1070 are preempted. It was improper, however, to enjoin §2(B) before the state courts had an opportunity to construe it and without some showing that enforcement of the provision in fact conflicts with federal immigration law and its objectives.

The judgment of the Court of Appeals for the Ninth Circuit is affirmed in part and reversed in part. The case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

## ARIZONA, ET AL., PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2012]

JUSTICE SCALIA, concurring in part and dissenting in part.

The United States is an indivisible "Union of sovereign States." *Hinderlider* v. *La Plata River & Cherry Creek Ditch Co.*, 304 U. S. 92, 104 (1938). Today's opinion, approving virtually all of the Ninth Circuit's injunction against enforcement of the four challenged provisions of Arizona's law, deprives States of what most would consider the defining characteristic of sovereignty: the power to exclude from the sovereign's territory people who have no right to be there. Neither the Constitution itself nor even any law passed by Congress supports this result. I dissent.

I

As a sovereign, Arizona has the inherent power to exclude persons from its territory, subject only to those limitations expressed in the Constitution or constitutionally imposed by Congress. That power to exclude has long been recognized as inherent in sovereignty. Emer de Vattel's seminal 1758 treatise on the Law of Nations stated:

> "The sovereign may forbid the entrance of his territory either to foreigners in general, or in particular cases, or to certain persons, or for certain particular purposes, according as he may think it advantageous to

the state. There is nothing in all this, that does not
flow from the rights of domain and sovereignty: every
one is obliged to pay respect to the prohibition; and
whoever dares violate it, incurs the penalty decreed
to render it effectual." The Law of Nations, bk. II,
ch. VII, §94, p. 309 (B. Kapossy & R. Whatmore eds.
2008).

See also I R. Phillimore, Commentaries upon International
Law, pt. III, ch. X, p. 233 (1854) ("It is a received maxim
of International Law that, the Government of a State may
prohibit the entrance of strangers into the country").[1]

There is no doubt that "before the adoption of the consti-
tution of the United States" each State had the author-
ity to "prevent [itself] from being burdened by an influx of
persons." *Mayor of New York* v. *Miln*, 11 Pet. 102, 132–
133 (1837). And the Constitution did not strip the States
of that authority. To the contrary, two of the Constitu-
tion's provisions were designed to enable the States to
prevent "the intrusion of obnoxious aliens through other
States." Letter from James Madison to Edmund Randolph
(Aug. 27, 1782), in 1 The Writings of James Madison 226
(1900); accord, The Federalist No. 42, pp. 269–271 (C.
Rossiter ed. 1961) (J. Madison). The Articles of Confeder-

--------

[1] Many of the 17th-, 18th-, and 19th-century commentators main-
tained that states should exclude foreigners only for good reason.
Pufendorf, for example, maintained that states are generally expected
to grant "permanent settlement to strangers who have been driven
from their former home," though acknowledging that, when faced with
the prospect of mass immigration, "every state may decide after its own
custom what privilege should be granted in such a situation." 2 Of the
Law of Nature and Nations, bk. III, ch. III, §10, p. 366 (C. Oldfather &
W. Oldfather eds. 1934). See generally Cleveland, Powers Inherent in
Sovereignty: Indians, Aliens, Territories, and the Nineteenth Century
Origins of Plenary Power over Foreign Affairs, 81 Tex. L. Rev. 1, 83–87
(2002). But the authority to exclude was universally accepted as
inherent in sovereignty, whatever prudential limitations there might be
on its exercise.

ation had provided that "the free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States." Articles of Confederation, Art. IV. This meant that an unwelcome alien could obtain all the rights of a citizen of one State simply by first becoming an *inhabitant* of another. To remedy this, the Constitution's Privileges and Immunities Clause provided that "[t]he *Citizens* of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Art. IV, §2, cl. 1 (emphasis added). But if one State had particularly lax citizenship standards, it might still serve as a gateway for the entry of "obnoxious aliens" into other States. This problem was solved "by authorizing the general government to establish a uniform rule of naturalization throughout the United States." The Federalist No. 42, *supra,* at 271; see Art. I, §8, cl. 4. In other words, the naturalization power was given to Congress not to abrogate States' power to exclude those they did not want, but to vindicate it.

Two other provisions of the Constitution are an acknowledgment of the States' sovereign interest in protecting their borders. Article I provides that "[n]o State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, *except what may be absolutely necessary for executing it's inspection Laws.*" Art. I, §10, cl. 2 (emphasis added). This assumed what everyone assumed: that the States could exclude from their territory dangerous or unwholesome goods. A later portion of the same section provides that "[n]o State shall, without the Consent of Congress, . . . engage in War, *unless actually invaded, or in such imminent Danger as will not admit of delay.*" Art. I, §10, cl. 3 (emphasis added). This limits the States' sovereignty (in a way not relevant here) but leaves intact their inherent power to protect their territory.

Notwithstanding "[t]he myth of an era of unrestricted

immigration" in the first 100 years of the Republic, the States enacted numerous laws restricting the immigration of certain classes of aliens, including convicted criminals, indigents, persons with contagious diseases, and (in Southern States) freed blacks. Neuman, The Lost Century of American Immigration (1776–1875), 93 Colum. L. Rev. 1833, 1835, 1841–1880 (1993). State laws not only provided for the removal of unwanted immigrants but also imposed penalties on unlawfully present aliens and those who aided their immigration.[2] *Id.,* at 1883.

In fact, the controversy surrounding the Alien and Sedition Acts involved a debate over whether, under the Constitution, the States had *exclusive* authority to enact such immigration laws. Criticism of the Sedition Act has become a prominent feature of our First Amendment jurisprudence, see, *e.g., New York Times Co.* v. *Sullivan*, 376 U. S. 254, 273–276 (1964), but one of the Alien Acts[3] also aroused controversy at the time:

> "*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That it shall be lawful for the President of the United States at any time during the continuance of this act, to *order* all such *aliens* as he shall judge dangerous to the peace and safety of the United States, or shall have reasonable grounds to suspect are concerned in any treasonable or secret machinations against the government thereof, to depart out of the territory of the United States . . . ." An Act concerning Aliens, 1 Stat. 570, 570–571.

————————

[2] *E.g.,* Va. Code Tit. 54, ch. 198, §39 (1849) ("If a master of a vessel or other person, knowingly, import or bring into this state, from any place out of the *United States*, any person convicted of crime . . . he shall be confined in jail for three months, and be fined one hundred dollars").

[3] There were two Alien Acts, one of which dealt only with enemy aliens. An Act respecting Alien Enemies, 1 Stat. 577.

The Kentucky and Virginia Resolutions, written in denunciation of these Acts, insisted that the power to exclude unwanted aliens rested solely in the States. Jefferson's Kentucky Resolutions insisted "that alien friends are under the jurisdiction and protection of the laws of the state wherein they are [and] that no power over them has been delegated to the United States, nor prohibited to the individual states, distinct from their power over citizens." Kentucky Resolutions of 1798, reprinted in J. Powell, Languages of Power: A Sourcebook of Early American Constitutional History 131 (1991). Madison's Virginia Resolutions likewise contended that the Alien Act purported to give the President "a power nowhere delegated to the federal government." Virginia Resolutions of 1798, reprinted in Powell, *supra,* at 134 (emphasis omitted). Notably, moreover, the Federalist proponents of the Act defended it primarily on the ground that "[t]he removal of aliens is the usual preliminary of hostility" and could therefore be justified in exercise of the Federal Government's war powers. Massachussets Resolutions in Reply to Virginia, reprinted in Powell, *supra,* at 136.

In *Mayor of New York* v. *Miln,* this Court considered a New York statute that required the commander of any ship arriving in New York from abroad to disclose "the name, place of birth, and last legal settlement, age and occupation . . . of all passengers . . . with the intention of proceeding to the said city." 11 Pet., at 130–131. After discussing the sovereign authority to regulate the entrance of foreigners described by De Vattel, the Court said:

> "The power . . . of New York to pass this law having undeniably existed at the formation of the constitution, the simply inquiry is, whether by that instrument it was taken from the states, and granted to congress; for if it were not, it yet remains with them." *Id.,* at 132.

And the Court held that it remains.  *Id.,* at 139.

## II

One would conclude from the foregoing that after the adoption of the Constitution there was some doubt about the power of the Federal Government to control immigration, but no doubt about the power of the States to do so. Since the founding era (though not immediately), doubt about the Federal Government's power has disappeared. Indeed, primary responsibility for immigration policy has shifted from the States to the Federal Government.  Congress exercised its power "[t]o establish an uniform Rule of Naturalization," Art. I, §8, cl. 4, very early on, see An Act to establish an uniform Rule of Naturalization, 1 Stat. 103.  But with the fleeting exception of the Alien Act, Congress did not enact any legislation regulating *immigration* for the better part of a century.  In 1862, Congress passed "An Act to prohibit the 'Coolie Trade' by American Citizens in American Vessels," which prohibited "procuring [Chinese nationals] . . . to be disposed of, or sold, or transferred, for any term of years or for any time whatever, as servants or apprentices, or to be held to service or labor."  12 Stat. 340.  Then, in 1875, Congress amended that act to bar admission to Chinese, Japanese, and other Asian immigrants who had "entered into a contract or agreement for a term of service within the United States, for lewd and immoral purposes."  An act supplementary to the acts in relation to immigration, ch. 141, 18 Stat. 477. And in 1882, Congress enacted the first general immigration statute.  See An act to regulate Immigration, 22 Stat. 214.  Of course, it hardly bears mention that Federal immigration law is now extensive.

I accept that as a valid exercise of federal power—not because of the Naturalization Clause (it has no necessary connection to citizenship) but because it is an inherent attribute of sovereignty no less for the United States than

for the States. As this Court has said, it is an "'accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions.'" *Fong Yue Ting* v. *United States*, 149 U. S. 698, 705 (1893) (quoting *Ekiu* v. *United States*, 142 U. S. 651, 659 (1892)). That is why there was no need to set forth control of immigration as one of the enumerated powers of Congress, although an acknowledgment of that power (as well as of the States' similar power, subject to federal abridgment) was contained in Art. I, §9, which provided that "[t]he Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight . . . ."

In light of the predominance of federal immigration restrictions in modern times, it is easy to lose sight of the States' traditional role in regulating immigration—and to overlook their sovereign prerogative to do so. I accept as a given that State regulation is excluded by the Constitution when (1) it has been prohibited by a valid federal law, or (2) it conflicts with federal regulation—when, for example, it admits those whom federal regulation would exclude, or excludes those whom federal regulation would admit.

Possibility (1) need not be considered here: there is no federal law prohibiting the States' sovereign power to exclude (assuming federal authority to enact such a law). The mere existence of federal action in the immigration area—and the so-called field preemption arising from that action, upon which the Court's opinion so heavily relies, *ante,* at 9–11—cannot be regarded as such a prohibition. We are not talking here about a federal law prohibiting the States from regulating bubble-gum advertising, or even the construction of nuclear plants. We are talking about a federal law going to the *core* of state sovereignty:

the power to exclude.  Like elimination of the States' other inherent sovereign power, immunity from suit, elimination of the States' sovereign power to exclude requires that "Congress . . . unequivocally expres[s] its intent to abrogate," *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 55 (1996) (internal quotation marks and citation omitted). Implicit "field preemption" will not do.

Nor can federal power over illegal immigration be deemed exclusive because of what the Court's opinion solicitously calls "foreign countries['] concern[s] about the status, safety, and security of their nationals in the United States," *ante*, at 3.  The Constitution gives all those on our shores the protections of the Bill of Rights—but just as those rights are not expanded for foreign nationals because of their countries' views (some countries, for example, have recently discovered the death penalty to be barbaric), neither are the fundamental sovereign powers of the States abridged to accommodate foreign countries' views.  Even in its international relations, the Federal Government must live with the inconvenient fact that it is a Union of independent States, who have their own sovereign powers.  This is not the first time it has found that a nuisance and a bother in the conduct of foreign policy. Four years ago, for example, the Government importuned us to interfere with thoroughly constitutional state judicial procedures in the criminal trial of foreign nationals because the international community, and even an opinion of the International Court of Justice, disapproved them.  See *Medellín* v. *Texas*, 552 U. S. 491 (2008).  We rejected that request, as we should reject the Executive's invocation of foreign-affairs considerations here.  Though it may upset foreign powers—and even when the Federal Government desperately wants to avoid upsetting foreign powers—the States have the right to protect their borders against foreign nationals, just as they have the right to execute foreign nationals for murder.

What this case comes down to, then, is whether the Arizona law conflicts with federal immigration law— whether it excludes those whom federal law would admit, or admits those whom federal law would exclude. It does not purport to do so. It applies only to aliens who neither possess a privilege to be present under federal law nor have been removed pursuant to the Federal Government's inherent authority. I proceed to consider the challenged provisions in detail.

## §2(B)

"For any lawful stop, detention or arrest made by a law enforcement official . . . in the enforcement of any other law or ordinance of a county, city or town or this state where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the immigration status of the person, except if the determination may hinder or obstruct an investigation. Any person who is arrested shall have the person's immigration status determined before the person is released. . . ." S. B. 1070, §2(B), as amended, Ariz. Rev. Stat. Ann. §11–1051(B) (West 2012).

The Government has conceded that "even before Section 2 was enacted, state and local officers had state-law authority to inquire of DHS [the Department of Homeland Security] about a suspect's unlawful status and otherwise cooperate with federal immigration officers." Brief for United States 47 (citing App. 62, 82); see also Brief for United States 48–49. That concession, in my view, obviates the need for further inquiry. The Government's conflict-pre-emption claim calls on us "to determine whether, *under the circumstances of this particular case*, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress." *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941) (emphasis added). It is impossible to make such a finding without a factual record concerning the manner in which Arizona is implementing these provisions—something the Government's pre-enforcement challenge has pretermitted. "The fact that [a law] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987). And on its face, §2(B) merely tells state officials that they are authorized to do something that they were, by the Government's concession, already authorized to do.

The Court therefore properly rejects the Government's challenge, recognizing that, "[a]t this stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume §2B will be construed in a way that creates a conflict with federal law." *Ante,* at 23. Before reaching that conclusion, however, the Court goes to great length to assuage fears that "state officers will be required to delay the release of some detainees for no reason other than to verify their immigration status." *Ante,* at 22. Of course, any investigatory detention, including one under §2(B), may become an "unreasonable . . . seizur[e]," U. S. Const., Amdt. IV, if it lasts too long. See *Illinois* v. *Caballes*, 543 U. S. 405, 407 (2005). But that has nothing to do with this case, in which the Government claims that §2(B) is pre-empted by federal immigration law, not that anyone's Fourth Amendment rights have been violated. And I know of no reason why a protracted detention that does not violate the Fourth Amendment would contradict or conflict with any federal immigration law.

§6

> "A peace officer, without a warrant, may arrest a per-
> son if the officer has probable cause to believe . . .
> [t]he person to be arrested has committed any public
> offense that makes the person removable from the
> United States."　S. B. 1070, §6(A)(5), Ariz. Rev. Stat.
> Ann. §13–3883(A)(5) (West Supp. 2011).

This provision of S. B. 1070 expands the statutory list of offenses for which an Arizona police officer may make an arrest without a warrant.　See §13–3883.　If an officer has probable cause to believe that an individual is "removable" by reason of a public offense, then a warrant is not required to make an arrest.　The Government's primary contention is that §6 is pre-empted by federal immigration law because it allows state officials to make arrests "without regard to federal priorities."　Brief for United States 53.　The Court's opinion focuses on limits that Congress has placed on *federal* officials' authority to arrest removable aliens and the possibility that state officials will make arrests "to achieve [Arizona's] own immigration policy" and "without any input from the Federal Government." *Ante,* at 17.

Of course on this pre-enforcement record there is no reason to assume that Arizona officials will ignore federal immigration policy (unless it be the questionable policy of not wanting to identify illegal aliens who have committed offenses that make them removable).　As Arizona points out, federal law expressly provides that state officers may "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," 8 U. S. C. §1357(g)(10)(B); and "cooperation" requires neither identical efforts nor prior federal approval.　It is consistent with the Arizona statute, and with the "cooperat[ive]" system that Congress has created, for state officials to arrest a removable alien,

contact federal immigration authorities, and follow their lead on what to do next. And it is an assault on logic to say that identifying a removable alien and holding him for federal determination of whether he should be removed "violates the principle that the removal process is entrusted to the discretion of the Federal Government," *ante,* at 18. The State's detention does not represent commencement of the removal process unless the Federal Government makes it so.

But that is not the most important point. The most important point is that, as we have discussed, Arizona is *entitled* to have "its own immigration policy"—including a more rigorous enforcement policy—so long as that does not conflict with federal law. The Court says, as though the point is utterly dispositive, that "it is not a crime for a removable alien to remain present in the United States," *ante,* at 15. It is not a federal crime, to be sure. But there is no reason Arizona cannot make it a state crime for a removable alien (or any illegal alien, for that matter) to remain present in Arizona.

The Court quotes 8 U. S. C. §1226(a), which provides that, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." Section 1357(a)(2) also provides that a federal immigration official "shall have power without warrant . . . to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [federal immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest." But statutory limitations upon the actions of federal officers in enforcing the United States' power to protect its borders do not on their face apply to the actions of state officers in enforcing the State's power to protect its borders. There is no more reason to read these provisions as implying that state officials are subject to similar limi-

tations than there is to read them as implying that only
federal officials may arrest removable aliens. And in any
event *neither* implication would constitute the sort of clear
elimination of the States' sovereign power that our cases
demand.

The Court raises concerns about "unnecessary harass-
ment of some aliens . . . whom federal officials determine
should not be removed." *Ante,* at 17. But we have no
license to assume, without any support in the record, that
Arizona officials would use their arrest authority under §6
to harass anyone. And it makes no difference that federal
officials might "determine [that some unlawfully present
aliens] should not be removed," *ibid.* They may well de-
termine not to remove from the United States aliens who
have no right to be here; but unless and until these aliens
have been given the right to remain, Arizona is entitled to
arrest them and *at least* bring them to federal officials'
attention, which is all that §6 necessarily entails. (In my
view, the State can go further than this, and punish them
for their unlawful entry and presence in Arizona.)

The Government complains that state officials might not
heed "federal priorities." Indeed they might not, particu-
larly if those priorities include willful blindness or delib-
erate inattention to the presence of removable aliens in
Arizona. The State's whole complaint—the reason this
law was passed and this case has arisen—is that the
citizens of Arizona believe federal priorities are too lax.
The State has the sovereign power to protect its borders
more rigorously if it wishes, absent any valid federal
prohibition. The Executive's policy choice of lax federal
enforcement does not constitute such a prohibition.

## §3

"In addition to any violation of federal law, a person is
guilty of willful failure to complete or carry an alien
registration document if the person is in violation of 8

[U. S. C.] §1304(e) or §1306(a)." S. B. 1070, §3(A), as amended, Ariz. Rev. Stat. Ann. §13–1509(A).

It is beyond question that a State may make violation of federal law a violation of state law as well. We have held that to be so even when the interest protected is a distinctively federal interest, such as protection of the dignity of the national flag, see *Halter* v. *Nebraska*, 205 U. S. 34 (1907), or protection of the Federal Government's ability to recruit soldiers, *Gilbert* v. *Minnesota*, 254 U. S. 325 (1920). "[T]he State is not inhibited from making the national purposes its own purposes to the extent of exerting its police power to prevent its own citizens from obstructing the accomplishment of such purposes." *Id.,* at 331 (internal quotation marks omitted). Much more is that so when, as here, the State is protecting its *own* interest, the integrity of its borders. And we have said that explicitly with regard to illegal immigration: "Despite the exclusive federal control of this Nation's borders, we cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns." *Plyler* v. *Doe*, 457 U. S. 202, 228, n. 23 (1982).

The Court's opinion relies upon *Hines* v. *Davidowitz*, *supra. Ante*, at 9–10. But that case did not, as the Court believes, establish a "field preemption" that implicitly eliminates the States' sovereign power to exclude those whom federal law excludes. It held that the States are not permitted to establish "additional or auxiliary" registration requirements for aliens. 312 U. S., at 66–67. But §3 does not establish additional or auxiliary registration requirements. It merely makes a violation of state law the *very same* failure to register and failure to carry evidence of registration that are violations of federal law. *Hines* does not prevent the State from relying on the federal

registration system as "an available aid in the enforce-ment of a number of statutes of the state applicable to aliens whose constitutional validity has not been ques-tioned." *Id.,* at 75–76 (Stone, J., dissenting). One such statute is Arizona's law forbidding illegal aliens to collect unemployment benefits, Ariz. Rev. Stat. Ann. §23–781(B) (West 2012). To enforce that and other laws that validly turn on alien status, Arizona has, in Justice Stone's words, an interest in knowing "the number and whereabouts of aliens within the state" and in having "a means of their identification," 312 U. S., at 75. And it can punish the aliens' failure to comply with the provisions of federal law that make that knowledge and identification possible.

In some areas of uniquely federal concern—*e.g.,* fraud in a federal administrative process (*Buckman Co.* v. *Plain-tiffs' Legal Comm.*, 531 U. S. 341 (2001)) or perjury in violation of a federally required oath (*In re Loney*, 134 U. S. 372 (1890))—this Court has held that a State has no legitimate interest in enforcing a federal scheme. But the federal alien registration system is certainly not of uniquely federal interest. States, private entities, and individuals rely on the federal registration system (including the E-Verify program) on a regular basis. Arizona's legitimate in-terest in protecting (among other things) its unemployment-benefits system is an entirely adequate basis for making the violation of federal registration and carry require-ments a violation of state law as well.

The Court points out, however, *ante,* at 11, that in some respects the state law exceeds the punishments prescribed by federal law: It rules out probation and pardon, which are available under federal law. The answer is that it makes no difference. Illegal immigrants who violate §3 violate *Arizona* law. It is one thing to say that the Su-premacy Clause prevents Arizona law from excluding those whom federal law admits. It is quite something else to say that a violation of Arizona law cannot be punished

more severely than a violation of federal law. Especially
where (as here) the State is defending its own sovereign
interests, there is no precedent for such a limitation. The
sale of illegal drugs, for example, ordinarily violates state
law as well as federal law, and no one thinks that the
state penalties cannot exceed the federal. As I have dis-
cussed, moreover, "field preemption" cannot establish a
prohibition of additional state penalties in the area of
immigration.

Finally, the Government also suggests that §3 poses an
obstacle to the administration of federal immigration law,
see Brief for United States 31–33, but "there is no conflict
in terms, and no possibility of such conflict, [if] the state
statute makes federal law its own," *California* v. *Zook*, 336
U. S. 725, 735 (1949).

It holds no fear for me, as it does for the Court, that
"[w]ere §3 to come into force, the State would have the
power to bring criminal charges against individuals for
violating a federal law even in circumstances where fed-
eral officials in charge of the comprehensive scheme de-
termine that prosecution would frustrate federal policies."
*Ante,* at 11. That seems to me entirely appropriate when
the State uses the federal law (as it must) as the criterion
for the exercise of *its own power*, and the implementation
of *its own policies* of excluding those who do not belong
there. What I do fear—and what Arizona and the States
that support it fear—is that "federal policies" of nonen-
forcement will leave the States helpless before those evil
effects of illegal immigration that the Court's opinion
dutifully recites in its prologue (*ante,* at 6) but leaves
unremedied in its disposition.

## §5(C)

"It is unlawful for a person who is unlawfully present
in the United States and who is an unauthorized alien
to knowingly apply for work, solicit work in a public

place or perform work as an employee or independent contractor in this state." S. B. 1070, §5(C), as amended, Ariz. Rev. Stat. Ann. §13–2928(C).

Here, the Court rightly starts with *De Canas* v. *Bica*, 424 U. S. 351 (1976), which involved a California law providing that "'[n]o employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers.'" *Id.*, at 352 (quoting California Labor Code Ann. §2805(a)). This Court concluded that the California law was not pre-empted, as Congress had neither occupied the field of "regulation of employment of illegal aliens" nor expressed "the clear and manifest purpose" of displacing such state regulation. *Id.,* at 356–357 (internal quotation marks omitted). Thus, at the time *De Canas* was decided, §5(C) would have been indubitably lawful.

The only relevant change is that Congress has since enacted its own restrictions on employers who hire illegal aliens, 8 U. S. C. §1324a, in legislation that also includes some civil (but no criminal) penalties on illegal aliens who accept unlawful employment. The Court concludes from this (reasonably enough) "that Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment," *ante*, at 13. But that is not the same as a deliberate choice to prohibit the States from imposing criminal penalties. Congress's intent with regard to exclusion of state law need not be guessed at, but is found in the law's express pre-emption provision, which excludes "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon *those who employ, or recruit or refer for a fee for employment,* unauthorized aliens," §1324a(h)(2) (emphasis added). Common sense, reflected in the canon *expressio unius est exclusio alterius*, suggests

that the specification of pre-emption for laws punishing "those who employ" implies the lack of pre-emption for other laws, including laws punishing "those who seek or accept employment."

The Court has no credible response to this. It quotes our jurisprudence to the effect that an "express pre-emption provisio[n] does *not* bar the ordinary working of conflict pre-emption principles." *Ante,* at 14 (quoting *Geier* v. *American Honda Motor Co.*, 529 U. S. 861, 869 (2000) (internal quotation marks omitted)). True enough— *conflict* preemption principles. It then goes on say that since "Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment," "[i]t follows that a state law to the contrary is an obstacle to the regulatory system Congress chose." *Ante,* at 15. For "'[w]here a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, *then* the pre-emptive inference can be drawn.'" *Ibid.* (quoting *Puerto Rico Dept. of Consumer Affairs* v. *ISLA Petroleum Corp.*, 485 U.S. 495, 503 (1988)). All that is a classic description not of *conflict* pre-emption but of *field* pre-emption, which (concededly) does not occur beyond the terms of an express pre-emption provision.

The Court concludes that §5(C) "would interfere with the careful balance struck by Congress," *ante,* at 15, (another field pre-emption notion, by the way) but that is easy to say and impossible to demonstrate. The Court relies primarily on the fact that "[p]roposals to make unauthorized work a criminal offense were debated and discussed during the long process of drafting [the Immigration Reform and Control Act of 1986 (IRCA)]," "[b]ut Congress rejected them." *Ante,* at 14. There is no more reason to believe that this rejection was expressive of a desire that there be no sanctions on employees, than expressive of a desire that such sanctions be left to the States. To tell the

truth, it was most likely expressive of what inaction ordinarily expresses: nothing at all. It is a "naïve assumption that the failure of a bill to make it out of committee, or to be adopted when reported to the floor, is the same as a congressional rejection of what the bill contained." *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 389 (2000) (SCALIA, J., concurring in judgment) (internal quotation marks and alterations omitted).

\*    \*    \*

The brief for the Government in this case asserted that "the Executive Branch's ability to exercise discretion and set priorities is particularly important because of the need to allocate scarce enforcement resources wisely." Brief for United States 21. Of course there is no reason why the Federal Executive's need to allocate *its* scarce enforcement resources should disable Arizona from devoting *its* resources to illegal immigration in Arizona that in its view the Federal Executive has given short shrift. Despite Congress's prescription that "the immigration laws of the United States should be enforced vigorously and uniformly," IRCA §115, 100 Stat. 3384, Arizona asserts without contradiction and with supporting citations:

> "[I]n the last decade federal enforcement efforts have focused primarily on areas in California and Texas, leaving Arizona's border to suffer from comparative neglect. The result has been the funneling of an increasing tide of illegal border crossings into Arizona. Indeed, over the past decade, over a third of the Nation's illegal border crossings occurred in Arizona." Brief for Petitioners 2–3 (footnote omitted).

Must Arizona's ability to protect its borders yield to the reality that Congress has provided inadequate funding for federal enforcement—or, even worse, to the Executive's unwise targeting of that funding?

But leave that aside.  It has become clear that federal enforcement priorities—in the sense of priorities based on the need to allocate "scarce enforcement resources"—is not the problem here.  After this case was argued and while it was under consideration, the Secretary of Homeland Security announced a program exempting from immigration enforcement some 1.4 million illegal immigrants under the age of 30.[4]  If an individual unlawfully present in the United States

>     "• came to the United States under the age of sixteen;
>
>     "• has continuously resided in the United States for at least five years . . . ,
>
>     "• is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran . . . ,
>
>     "• has not been convicted of a [serious crime]; and
>
>     "• is not above the age of thirty,"[5]

then U. S. immigration officials have been directed to "defe[r] action" against such individual "for a period of two years, subject to renewal."[6]  The husbanding of scarce enforcement resources can hardly be the justification for this, since the considerable administrative cost of conducting as many as 1.4 million background checks, and ruling on the biennial requests for dispensation that the nonen-

———————

[4] Preston & Cushman, Obama to Permit Young Migrants to Remain in U. S., N. Y. Times, June 16, 2012, p. A1.

[5] Memorandum from Janet Napolitano, Secretary of Homeland Security, to David V. Aguilar, Acting Commissioner, U. S. Customs and Border Protection; Alejandro Mayorkas, Director, U. S. Citizenship and Immigration Services; and John Morton, Director, U. S. Immigration and Customs Enforcement, p. 1 (June 15, 2012), online at http://www.dhs.gov (all Internet materials as visited June 22, 2012, and available in Clerk of Court's case file).

[6] *Id.,* at 2.

forcement program envisions, will necessarily be *deducted* from immigration enforcement. The President said at a news conference that the new program is "the right thing to do" in light of Congress's failure to pass the Administration's proposed revision of the Immigration Act.[7] Perhaps it is, though Arizona may not think so. But to say, as the Court does, that Arizona *contradicts federal law* by enforcing applications of the Immigration Act that the President declines to enforce boggles the mind.

The Court opinion's looming specter of inutterable horror—"[i]f §3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations," *ante,* at 10—seems to me not so horrible and even less looming. But there has come to pass, and is with us today, the specter that Arizona and the States that support it predicted: A Federal Government that does not want to enforce the immigration laws as written, and leaves the States' borders unprotected against immigrants whom those laws would exclude. So the issue is a stark one. Are the sovereign States at the mercy of the Federal Executive's refusal to enforce the Nation's immigration laws?

A good way of answering that question is to ask: Would the States conceivably have entered into the Union if the Constitution itself contained the Court's holding? Today's judgment surely fails that test. At the Constitutional Convention of 1787, the delegates contended with "the jealousy of the states with regard to their sovereignty." 1 Records of the Federal Convention 19 (M. Farrand ed. 1911) (statement of Edmund Randolph). Through ratification of the fundamental charter that the Convention produced, the States ceded much of their sovereignty to the Federal Government. But much of it remained jealously

————————

[7] Remarks by the President on Immigration (June 15, 2012), online at http://www.whitehouse.gov.

guarded—as reflected in the innumerable proposals that never left Independence Hall.  Now, imagine a provision—perhaps inserted right after Art. I, §8, cl. 4, the Naturalization Clause—which included among the enumerated powers of Congress "To establish Limitations upon Immigration that will be exclusive and that will be enforced only to the extent the President deems appropriate."  The delegates to the Grand Convention would have rushed to the exits.

As is often the case, discussion of the dry legalities that are the proper object of our attention suppresses the very human realities that gave rise to the suit.  Arizona bears the brunt of the country's illegal immigration problem.  Its citizens feel themselves under siege by large numbers of illegal immigrants who invade their property, strain their social services, and even place their lives in jeopardy.  Federal officials have been unable to remedy the problem, and indeed have recently shown that they are unwilling to do so.  Thousands of Arizona's estimated 400,000 illegal immigrants—including not just children but men and women under 30—are now assured immunity from enforcement, and will be able to compete openly with Arizona citizens for employment.

Arizona has moved to protect its sovereignty—not in contradiction of federal law, but in complete compliance with it.  The laws under challenge here do not extend or revise federal immigration restrictions, but merely enforce those restrictions more effectively.  If securing its territory in this fashion is not within the power of Arizona, we should cease referring to it as a sovereign State.  I dissent.

# SUPREME COURT OF THE UNITED STATES

No. 11–182

ARIZONA, ET AL., PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2012]

JUSTICE THOMAS, concurring in part and dissenting in part.

I agree with JUSTICE SCALIA that federal immigration law does not pre-empt any of the challenged provisions of S. B. 1070. I reach that conclusion, however, for the simple reason that there is no conflict between the "ordinary meanin[g]" of the relevant federal laws and that of the four provisions of Arizona law at issue here. *Wyeth* v. *Levine*, 555 U. S. 555, 588 (2009) (THOMAS, J., concurring in judgment) ("Pre-emption analysis should not be a free-wheeling judicial inquiry into whether a state statute is in tension with federal objectives, but an inquiry into whether the ordinary meanings of state and federal law conflict" (brackets; internal quotation marks omitted)).

Section 2(B) of S. B. 1070 provides that, when Arizona law enforcement officers reasonably suspect that a person they have lawfully stopped, detained, or arrested is unlawfully present, "a reasonable attempt shall be made, when practicable, to determine the immigration status of the person" pursuant to the verification procedure established by Congress in 8 U. S. C. §1373(c). Ariz. Rev. Stat. Ann. §11–1051(B) (West 2012). Nothing in the text of that or any other federal statute prohibits Arizona from directing its officers to make immigration-related inquiries in these situations. To the contrary, federal law expressly states that "no State or local government entity may be prohib-

ited, or in any way restricted, from sending to or receiving from" federal officials "information regarding the immigration status" of an alien. 8 U. S. C. §1644. And, federal law imposes an affirmative obligation on federal officials to respond to a State's immigration-related inquiries. §1373(c).

Section 6 of S. B. 1070 authorizes Arizona law enforcement officers to make warrantless arrests when there is probable cause to believe that an arrestee has committed a public offense that renders him removable under federal immigration law. States, as sovereigns, have inherent authority to conduct arrests for violations of federal law, unless and until Congress removes that authority. See *United States* v. *Di Re*, 332 U. S. 581, 589 (1948) (holding that state law determines the validity of a warrantless arrest for a violation of federal law "in the absence of an applicable federal statute"). Here, no federal statute purports to withdraw that authority. As JUSTICE SCALIA notes, *ante,* at 12 (opinion concurring in part and dissenting in part), federal law does limit the authority of *federal* officials to arrest removable aliens, but those statutes do not apply to *state* officers. And, federal law expressly recognizes that state officers may "cooperate with the Attorney General" in the "apprehension" and "detention" of "aliens not lawfully present in the United States." §1357(g)(10)(B). Nothing in that statute indicates that such cooperation requires a prior "request, approval, or other instruction from the Federal Government." *Ante,* at 18 (majority opinion).

Section 3 of S. B. 1070 makes it a crime under Arizona law for an unlawfully present alien to willfully fail to complete or carry an alien registration document in violation of 8 U. S. C. §1304(e) and §1306(a). Section 3 simply incorporates federal registration standards. Unlike the Court, I would not hold that Congress pre-empted the field of enforcing those standards. "[O]ur recent cases have

frequently rejected field pre-emption in the absence of statutory language expressly requiring it." *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 617 (1997) (THOMAS, J., dissenting); see, *e.g., New York State Dept. of Social Servs.* v. *Dublino*, 413 U. S. 405, 415 (1973). Here, nothing in the text of the relevant federal statutes indicates that Congress intended enforcement of its registration requirements to be exclusively the province of the Federal Government. That Congress created a "full set of standards governing alien registration," *ante,* at 10 (majority opinion), merely indicates that it intended the scheme to be capable of working on its own, not that it wanted to preclude the States from enforcing the federal standards. *Hines* v. *Davidowitz*, 312 U. S. 52 (1941), is not to the contrary. As JUSTICE SCALIA explains, *ante,* at 14, *Hines* at most holds that federal law pre-empts the States from creating additional registration requirements. But here, Arizona is merely seeking to enforce the very registration requirements that Congress created.

Section 5(C) of S. B. 1070 prohibits unlawfully present aliens from knowingly applying for, soliciting, or performing work in Arizona. Section 5(C) operates only on individuals whom Congress has already declared ineligible to work in the United States. Nothing in the text of the federal immigration laws prohibits States from imposing their own criminal penalties on such individuals. Federal law expressly pre-empts States from "imposing civil or criminal sanctions (other than through licensing and similar laws) upon *those who employ*, or recruit or refer for a fee for employment, unauthorized aliens." 8 U. S. C. §1324a(h)(2) (emphasis added). But it leaves States free to impose criminal sanctions on the employees themselves.

Despite the lack of any conflict between the ordinary meaning of the Arizona law and that of the federal laws at issue here, the Court holds that various provisions of the Arizona law are pre-empted because they "stan[d] as an

obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, *supra*, at 67. I have explained that the "purposes and objectives" theory of implied pre-emption is inconsistent with the Constitution because it invites courts to engage in freewheeling speculation about congressional purpose that roams well beyond statutory text. See *Wyeth*, 555 U. S., at 604 (opinion concurring in judgment); see also *Williamson* v. *Mazda Motor of America, Inc.*, 562 U. S. ___, ___–___ (2011) (opinion concurring in judgment) (slip op., at 2–3); *Haywood* v. *Drown*, 556 U. S. 729, 767 (2009) (dissenting opinion). Under the Supremacy Clause, pre-emptive effect is to be given to congressionally enacted laws, not to judicially divined legislative purposes. See *Wyeth*, *supra*, at 604 (THOMAS, J., concurring in judgment). Thus, even assuming the existence of some tension between Arizona's law and the supposed "purposes and objectives" of Congress, I would not hold that any of the provisions of the Arizona law at issue here are pre-empted on that basis.

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–182

_____

## ARIZONA, ET AL., PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2012]

JUSTICE ALITO, concurring in part and dissenting in part.

This case concerns four provisions of Arizona's Support Our Law Enforcement and Safe Neighborhoods Act, S. B. 1070. Section 2(B) requires Arizona law enforcement officers to make a "reasonable attempt," "when practicable," to ascertain the immigration status of any person whom an officer lawfully stops, detains, or arrests "where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States." Ariz. Rev. Stat. Ann. §11–1051(B) (West 2012). Section 3 provides that an alien who willfully fails "to complete or carry an alien registration document" in violation of 8 U. S. C. §1304(e) or §1306(a) is guilty of a misdemeanor. Ariz. Rev. Stat. Ann. §13–1509(A) (West Supp. 2011). Section 5(C) makes it a misdemeanor for an unauthorized alien who is unlawfully present in the United States "to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor." Ariz. Rev. Stat. Ann. §13–2928(C). And §6 authorizes Arizona law enforcement officers to arrest without a warrant any person who an officer has probable cause to believe "has committed any public offense that makes the person removable from the United States." Ariz. Rev. Stat. Ann. §13–3883(A)(5).

I agree with the Court that §2(B) is not pre-empted.

That provision does not authorize or require Arizona law enforcement officers to do anything they are not already allowed to do under existing federal law. The United States' argument that §2(B) is pre-empted, not by any federal statute or regulation, but simply by the Executive's current enforcement policy is an astounding assertion of federal executive power that the Court rightly rejects.

I also agree with the Court that §3 is pre-empted by virtue of our decision in *Hines* v. *Davidowitz*, 312 U. S. 52 (1941). Our conclusion in that case that Congress had enacted an "all-embracing system" of alien registration and that States cannot "enforce additional or auxiliary regulations," *id.,* at 66–67, 74, forecloses Arizona's attempt here to impose additional, state-law penalties for violations of the federal registration scheme.

While I agree with the Court on §2(B) and §3, I part ways on §5(C) and §6. The Court's holding on §5(C) is inconsistent with *De Canas* v. *Bica*, 424 U. S. 351 (1976), which held that employment regulation, even of aliens unlawfully present in the country, is an area of traditional state concern. Because state police powers are implicated here, our precedents require us to presume that federal law does not displace state law unless Congress' intent to do so is clear and manifest. I do not believe Congress has spoken with the requisite clarity to justify invalidation of §5(C). Nor do I believe that §6 is invalid. Like §2(B), §6 adds virtually nothing to the authority that Arizona law enforcement officers already exercise. And whatever little authority they have gained is consistent with federal law.

*Section 2(B)*

A

Although §2(B) of the Arizona law has occasioned much controversy, it adds nothing to the authority that Arizona law enforcement officers, like officers in all other States, already possess under federal law. For that reason, I

agree with the Court that §2(B) is not pre-empted.

Section 2(B) quite clearly does not expand the authority of Arizona officers to make stops or arrests. It is triggered only when a "lawful stop, detention or arrest [is] made . . . in the enforcement of *any other [state or local] law or ordinance*." Ariz. Rev. Stat. Ann. §11–1051(B) (emphasis added). Section 2(B) thus comes into play only when an officer has reasonable suspicion or probable cause to believe that a person has committed a nonimmigration offense. Arizona officers plainly possessed this authority before §2(B) took effect.

Section 2(B) also does not expand the authority of Arizona officers to inquire about the immigration status of persons who are lawfully detained. When a person is stopped or arrested and "reasonable suspicion exists that the person is an alien and is unlawfully present in the United States," §2(B) instructs Arizona officers to make a "reasonable attempt," "when practicable," to ascertain that person's immigration status. Ariz. Rev. Stat. Ann. §11–1051(B). Even before the Arizona Legislature enacted §2(B), federal law permitted state and local officers to make such inquiries. In 8 U. S. C. §1357(g)(10)(A), Congress has made clear that state and local governments need not enter into formal agreements with the Federal Government in order "to communicate with the [Federal Government] regarding the immigration status of any individual." In addition, Congress has mandated that neither the Federal Government nor any state or local government may "prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [the Federal Government] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." §1373(a); see also §1644 (providing that "no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [the Federal Government] information regarding the

immigration status, lawful or unlawful, of an alien in the
United States"). And while these provisions preserve the
authority of state and local officers to seek immigration-
status information from the Federal Government, another
federal statute, §1373(c), requires that the Federal Gov-
ernment respond to any such inquiries "by providing the
requested verification or status information." It comes
as no surprise, therefore, that many States and localities
permit their law enforcement officers to make the kinds of
inquiries that §2(B) prescribes. See App. 294–298 (report-
ing that officers in 59 surveyed state and local jurisdic-
tions "generally" ask arrestees about their immigration
status while 34 do not and that officers in 78 jurisdictions
"generally" inform Immigration and Customs Enforcement
(ICE) when they believe an arrestee to be an undocumented
alien while only 17 do not). Congress has invited state
and local governments to make immigration-related in-
quiries and has even obligated the Federal Government to
respond. Through §2(B), Arizona has taken Congress up
on that invitation.

The United States does not deny that officers may, *at
their own discretion*, inquire about the immigration status
of persons whom they lawfully detain. Instead, the United
States argues that §2(B) is pre-empted because it impedes
federal-state cooperation by *mandating* that officers verify
the immigration status of every detained person if there is
reason to believe that the person is unlawfully present in
the country. The United States claims that §2(B)'s man-
date runs contrary to federal law in that it "precludes
officers from taking [the Federal Government's] priorities
and discretion into account." Brief for United States
50. "[B]y interposing a mandatory state law between state
and local officers and their federal counterparts," writes
the United States, §2(B) "stands as an obstacle to the ac-
complishment of the federal requirement of cooperation
and the full effectuation of the enforcement judgment and

discretion Congress has vested in the Executive Branch."
*Ibid.* (internal quotation marks and citation omitted).

The underlying premise of the United States' argument
seems to be that state and local officers, when left to their
own devices, generally take federal enforcement priorities
into account. But there is no reason to think that this
premise is true. And even if it were, it would not follow
that §2(B)'s blanket mandate is at odds with federal law.
Nothing in the relevant federal statutes *requires* state and
local officers to consider the Federal Government's priori-
ties before requesting verification of a person's immigra-
tion status. Neither 8 U. S. C. §1357(g)(10) nor §1373(a)
conditions the right of state and local officers to communi-
cate with the Federal Government on their first taking
account of its priorities. Nor does §1373(c) condition the
Federal Government's obligation to answer requests for in-
formation on the sensitivity of state and local officers to
its enforcement discretion. In fact, §1373(c) dictates that
the Federal Government "shall respond" to any inquiry
seeking verification of immigration status, and that com-
mand applies whether or not the requesting officer has
bothered to consider federal priorities. Because no federal
statute requires such consideration, §2(B) does not conflict
with federal law.

In any event, it is hard to see how state and local offi-
cers could proceed in conformity with the Federal Govern-
ment's enforcement priorities without making an inquiry
into a suspected alien's immigration status. For example,
one of the Federal Government's highest priorities is the
apprehension and removal of aliens who have failed to
comply with a final order of removal. See App. 108. How
can an officer identify those persons without first in-
quiring about their status? At bottom, the discretion
that ultimately matters is not whether to verify a person's
immigration status but whether to act once the person's
status is known. For that reason, §2(B)'s verification

requirement is not contrary to federal law because the Federal Government retains the discretion that matters most—that is, the discretion to enforce the law in particular cases. If an Arizona officer contacts the Federal Government to verify a person's immigration status and federal records reveal that the person is in the country unlawfully, the Federal Government decides, presumably based on its enforcement priorities, whether to have the person released or transferred to federal custody. Enforcement discretion thus lies with the Federal Government, not with Arizona. Nothing in §2(B) suggests otherwise.

The United States' attack on §2(B) is quite remarkable. The United States suggests that a state law may be preempted, not because it conflicts with a federal statute or regulation, but because it is inconsistent with a federal agency's current enforcement priorities. Those priorities, however, are not law. They are nothing more than agency policy. I am aware of no decision of this Court recognizing that mere policy can have pre-emptive force. Cf. *Barclays Bank PLC* v. *Franchise Tax Bd. of Cal.*, 512 U. S. 298, 330 (1994) (holding that "Executive Branch communications that express federal policy but lack the force of law cannot render unconstitutional" an "otherwise valid, congressionally condoned" state law). If §2(B) were pre-empted at the present time because it is out of sync with the Federal Government's current priorities, would it be unpre-empted at some time in the future if the agency's priorities changed?

Like most law enforcement agencies, ICE does not set out inflexible rules for its officers to follow. To the contrary, it provides a list of factors to guide its officers' enforcement discretion on a case-by-case basis. See Memorandum from John Morton, Director, ICE, to All Field Office Directors et al., p. 4 (June 17, 2011) ("This list is not exhaustive and no one factor is determinative. ICE offi-

cers, agents, and attorneys should always consider prose-cutorial discretion on a case-by-case basis. The decisions should be based on the totality of the circumstances, with the goal of conforming to ICE's enforcement priorities"). Among those factors is "the agency's civil immigration enforcement priorities," *ibid.*, which change from administration to administration. If accepted, the United States' pre-emption argument would give the Executive unprecedented power to invalidate state laws that do not meet with its approval, even if the state laws are otherwise consistent with federal statutes and duly promulgated regulations. This argument, to say the least, is fundamentally at odds with our federal system.

## B

It has been suggested that §2(B) will cause some persons who are lawfully stopped to be detained in violation of their constitutional rights while a prolonged investigation of their immigration status is undertaken. But nothing on the face of the law suggests that it will be enforced in a way that violates the Fourth Amendment or any other provision of the Constitution. The law instructs officers to make a "reasonable attempt" to investigate immigration status, and this language is best understood as incorporating the Fourth Amendment's standard of reasonableness. Indeed, the Arizona Legislature has directed that §2(B) "shall be implemented in a manner consistent with federal laws . . . protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens." Ariz. Rev. Stat. Ann. §11–1051(L).

In the situations that seem most likely to occur, enforcement of §2(B) will present familiar Fourth Amendment questions. To take a common situation, suppose that a car is stopped for speeding, a nonimmigration offense. (Recall that §2(B) comes into play only where a stop or arrest is made for a nonimmigration offense.) Suppose

also that the officer who makes the stop subsequently acquires reasonable suspicion to believe that the driver entered the country illegally, which is a federal crime. See 8 U. S. C. §1325(a).

It is well established that state and local officers generally have authority to make stops and arrests for violations of federal criminal laws. See, *e.g., Miller* v. *United States*, 357 U. S. 301, 305 (1958); *United States* v. *Di Re*, 332 U. S. 581, 589 (1948). I see no reason why this principle should not apply to immigration crimes as well. Lower courts have so held. See, *e.g., Estrada* v. *Rhode Island*, 594 F. 3d 56, 65 (CA1 2010) (upholding the lawfulness of a detention because the officer had an objectively reasonable belief that the arrestees "had committed immigration violations"); *United States* v. *Vasquez-Alvarez*, 176 F. 3d 1294, 1296 (CA10 1999) (noting that "state law-enforcement officers have the general authority to investigate and make arrests for violations of federal immigration laws"); *Gonzales* v. *Peoria*, 722 F. 2d 468, 475 (CA9 1983), overruled on other grounds, *Hodgers-Durgin* v. *de la Vina*, 199 F. 3d 1037 (1999) (en banc) (holding that "federal law does not preclude local enforcement of the criminal provisions" of federal immigration law). And the United States, consistent with the position long taken by the Office of Legal Counsel (OLC) in the Department of Justice, does not contend otherwise. See Brief for United States 55, n. 33; see also Memorandum from OLC to the Attorney General (Apr. 3, 2002), App. 268–273; Assistance by State and Local Police in Apprehending Illegal Aliens, 20 Op. Off. Legal Counsel 26 (1996).

More importantly, no federal statute casts doubt on this authority. To be sure, there are a handful of statutes that purport to authorize state and local officers to make immigration-related arrests in *certain* situations. See, *e.g.,* 8 U. S. C. §1103(a)(10) (providing for the extension of "any" immigration enforcement authority to state and local

officers in the event of an "actual or imminent mass influx of aliens arriving off the coast"); §1252c(a) (providing authority to arrest criminal aliens who had illegally reentered the country but only after consultation with the Federal Government); §1324(c) (providing authority to make arrests for transporting and harboring certain aliens). But a grant of federal arrest authority in some cases does not manifest a clear congressional intent to displace the States' police powers in all other cases. Without more, such an inference is too weak to overcome our presumption against pre-emption where traditional state police powers are at stake. Accordingly, in our hypothetical case, the Arizona officer may arrest the driver for violating §1325(a) if the officer has probable cause. And if the officer has reasonable suspicion, the officer may detain the driver, to the extent permitted by the Fourth Amendment, while the question of illegal entry is investigated.

We have held that a detention based on reasonable suspicion that the detainee committed a particular crime "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois* v. *Caballes*, 543 U. S. 405, 407 (2005). But if during the course of a stop an officer acquires suspicion that a detainee committed a different crime, the detention may be extended for a reasonable time to verify or dispel that suspicion. Cf. *Muehler* v. *Mena*, 544 U. S. 93, 101 (2005) (holding that "no additional Fourth Amendment justification" was required because any questioning concerning immigration status did not prolong the detention). In our hypothetical case, therefore, if the officer, after initially stopping the car for speeding, has a reasonable suspicion that the driver entered the country illegally, the officer may investigate for evidence of illegal entry. But the length and nature of this investigation must remain within the limits set out in our Fourth Amendment cases. An investigative stop, if prolonged, can become an arrest and

thus require probable cause.  See *Caballes*, *supra*, at 407. Similarly, if a person is moved from the site of the stop, probable cause will likely be required.  See *Hayes* v. *Florida*, 470 U. S. 811, 816 (1985) (holding that the line between detention and arrest is crossed "when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes").

If properly implemented, §2(B) should not lead to federal constitutional violations, but there is no denying that enforcement of §2(B) will multiply the occasions on which sensitive Fourth Amendment issues will crop up.  These civil-liberty concerns, I take it, are at the heart of most objections to §2(B).  Close and difficult questions will inevitably arise as to whether an officer had reasonable suspicion to believe that a person who is stopped for some other reason entered the country illegally, and there is a risk that citizens, lawful permanent residents, and others who are lawfully present in the country will be detained. To mitigate this risk, Arizona could issue guidance to officers detailing the circumstances that typically give rise to reasonable suspicion of unlawful presence.  And in the spirit of the federal-state cooperation that the United States champions, the Federal Government could share its own guidelines.  Arizona could also provide officers with a nonexclusive list containing forms of identification sufficient under §2(B) to dispel any suspicion of unlawful presence.  If Arizona accepts licenses from most States as proof of legal status, the problem of roadside detentions will be greatly mitigated.[1]

––––––––––

[1] When the Real ID Act takes effect, the Federal Government will no longer accept state forms of identification that fail to meet certain federal requirements.  §202(a)(1), 119 Stat. 312.  One requirement is that any identification be issued only on proof that the applicant is lawfully present in the United States. §202(c)(2)(B), *id.,* at 313.  I

### *Section 3*

I agree that §3 is pre-empted because, like the Court, I read the opinion in *Hines* to require that result. Although there is some ambiguity in *Hines*, the Court largely spoke in the language of field pre-emption. The Court explained that where Congress "has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." 312 U. S., at 66–67. In finding the Pennsylvania alien-registration law pre-empted, the Court observed that Congress had "provided a standard for alien registration in a single integrated and all-embracing system" and that its intent was "to protect the personal liberties of law-abiding aliens through one uniform national registration system." *Id.,* at 74. If we credit our holding in *Hines* that Congress has enacted "a single integrated and all-embracing system" of alien registration and that States cannot "complement" that system or "enforce additional or auxiliary regulations," *id.,* at 66–67, 74, then Arizona's attempt to impose additional, state-law penalties for violations of federal registration requirements must be invalidated.

### *Section 5(C)*

While I agree that §3 is pre-empted, I disagree with the Court's decision to strike down §5(C). I do so in large measure because the Court fails to give the same solicitude to our decision in *De Canas*, 424 U. S. 351, as it is willing to give our decision in *Hines*. In *De Canas*, the Court upheld against a pre-emption challenge a state law imposing fines on employers that hired aliens who were

--------

anticipate that most, if not all, States will eventually issue forms of identification that suffice to establish lawful presence under §2(B).

unlawfully present in the United States. The Court explained that the mere fact that "aliens are the subject of a state statute does not render it a regulation of immigration." 424 U. S., at 355. The Court emphasized instead that "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." *Id.,* at 356. In light of that broad authority, the Court declared that "[o]nly a demonstration that complete ouster of state power . . . was 'the clear and manifest purpose of Congress' would justify" the conclusion that "state regulation designed to protect vital state interests must give way to paramount federal legislation." *Id.,* at 357 (some internal quotation marks omitted); see also *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 449 (2005) ("In areas of traditional state regulation, [the Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest'" (some internal quotation marks omitted)).

The Court now tells us that times have changed. Since *De Canas*, Congress has enacted "a comprehensive framework for combating the employment of illegal aliens," and even though aliens who seek or obtain unauthorized work are not subject to criminal sanctions, they can suffer civil penalties. *Ante,* at 12–13 (internal quotation marks omitted). Undoubtedly, federal regulation in this area is more pervasive today. But our task remains unchanged: to determine whether the federal scheme discloses a clear and manifest congressional intent to displace state law.

The Court gives short shrift to our presumption *against* pre-emption. Having no express statement of congressional intent to support its analysis, the Court infers from stale legislative history and from the comprehensiveness of the federal scheme that "Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment." *Ante,* at 13.

Because §5(C) imposes such penalties, the Court concludes that it stands as an obstacle to the method of enforcement chosen by Congress. *Ante,* at 15.

The one thing that is clear from the federal scheme is that Congress chose not to impose *federal* criminal penalties on aliens who seek or obtain unauthorized work. But that does not mean that Congress also chose to pre-empt *state* criminal penalties. The inference is plausible, but far from necessary. As we have said before, the "decision not to adopt a regulation" is not "the functional equivalent of a regulation prohibiting all States and their political subdivisions from adopting such a regulation." *Sprietsma* v. *Mercury Marine*, 537 U. S. 51, 65 (2002). With any statutory scheme, Congress chooses to do some things and not others. If that alone were enough to demonstrate pre-emptive intent, there would be little left over for the States to regulate, especially now that federal authority reaches so far and wide. States would occupy tiny islands in a sea of federal power. This explains why state laws implicating traditional state powers are not pre-empted unless there is a "clear and manifest" congressional intention to do so.

Not only is there little evidence that Congress intended to pre-empt state laws like §5(C), there is some evidence that Congress intended the opposite result. In making it unlawful for employers to hire unauthorized aliens, see 8 U. S. C. §1324a(a), Congress made it clear that "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws)" upon employers was pre-empted, §1324a(h)(2). Noticeably absent is any similar directive pre-empting state or local laws targeting aliens who seek or obtain unauthorized employment. Given that Congress expressly pre-empted certain state and local laws pertaining to employers but remained silent about laws pertaining to employees, one could infer that Congress intended to preserve state and local authority to

regulate the employee side of the equation. At the very least, it raises serious doubts about whether Congress intended to pre-empt such authority.

The Court dismisses any inferences that might be drawn from the express pre-emption provision. See *ante,* at 14. But even though the existence of that provision "does *not* bar the ordinary working of conflict pre-emption principles" or impose a "'special burden'" against pre-emption, *Geier* v. *American Honda Motor Co.*, 529 U. S. 861, 869–870 (2000), it is still probative of congressional intent. And it is the intent of Congress that is the "ultimate touchstone." *Retail Clerks* v. *Schermerhorn*, 375 U. S. 96, 103 (1963).

The Court infers from Congress' decision not to impose *federal* criminal penalties that Congress intended to pre-empt *state* criminal penalties. But given that the express pre-emption provision covers only state and local laws regulating *employers*, one could just as well infer that Congress did not intend to pre-empt state or local laws aimed at alien *employees* who unlawfully seek or obtain work. Surely Congress' decision not to extend its express pre-emption provision to state or local laws like §5(C) is more probative of its intent on the subject of pre-emption than its decision not to impose federal criminal penalties for unauthorized work. In any event, the point I wish to emphasize is that inferences can be drawn either way. There are no necessary inferences that point decisively for or against pre-emption. Therefore, if we take seriously that state employment regulation is a traditional state concern and can be pre-empted only on a showing of "clear and manifest" congressional intent as required by *De Canas*, then §5(C) must survive. "Our precedents establish that a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act." *Chamber of Commerce of United States of America* v. *Whiting*, 563 U. S. ___, ___ (2011) (plurality opinion)

(slip op., at 22) (internal quotation marks omitted). I do not believe the United States has surmounted that barrier here.

*Section 6*

I also disagree with the Court's decision that §6 is preempted. This provision adds little to the authority that Arizona officers already possess, and whatever additional authority it confers is consistent with federal law. Section 6 amended an Arizona statute that authorizes warrantless arrests. See Ariz. Rev. Stat. §13–3883 (West 2010). Before §6 was added, that statute already permitted arrests without a warrant for felonies, misdemeanors committed in the arresting officer's presence, petty offenses, and certain traffic-related criminal violations. See §§13–3883(A)(1)–(4). Largely duplicating the authority already conferred by these prior subsections, §6 added a new subsection, §13–3883(A)(5) (West Supp. 2011), that authorizes officers to make warrantless arrests on probable cause that the arrestee has committed a "public offense" for which the arrestee is removable from the United States. A "public offense" is defined as conduct that is punishable by imprisonment or a fine according to the law of the State where the conduct occurred and that would be punishable under Arizona law had the conduct occurred in Arizona. See §13–105(27).

In what way, if any, does §6 enlarge the arrest authority of Arizona officers? It has been suggested that §6 confers new authority in the following three circumstances: (1) where the arrestee committed but has not been charged with committing an offense in another State; (2) where the officer has probable cause to believe the arrestee committed an offense for which he was previously arrested but not prosecuted; and (3) where the arrestee committed but has already served the sentence for a removable offense. 641 F. 3d 359, 361 (CA9 2011). These are exceedingly

narrow categories, involving circumstances that will rarely arise. But such cases are possible, and therefore we must decide whether there are circumstances under which federal law precludes a state officer from making an arrest based on probable cause that the arrestee committed a removable offense.

A

The idea that state and local officers may carry out arrests in the service of federal law is not unprecedented. As previously noted, our cases establish that state and local officers may make warrantless arrests for violations of federal law and that "in the absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity." *Di Re*, 332 U. S., at 589; see also *Miller,* 357 U. S., at 305 (stating that, where a state officer makes an arrest based on federal law, "the lawfulness of the arrest without warrant is to be determined by reference to state law"). Therefore, given the premise, which I understand both the United States and the Court to accept, that state and local officers do have inherent authority to make arrests in aid of federal law, we must ask whether Congress has done anything to curtail or pre-empt that authority in this particular case.

Neither the United States nor the Court goes so far as to say that state and local officers have no power to arrest criminal aliens based on their removability. To do so would fly in the face of 8 U. S. C. §1357(g)(10). Under §§1357(g)(1)–(9), the Federal Government may enter into formal agreements with States and municipalities under which their officers may perform certain duties of a federal immigration officer. But §1357(g)(10)(B) makes clear that States and municipalities need not enter into those agreements "otherwise to cooperate . . . in the identification, apprehension, detention, or removal of aliens not

lawfully present in the United States." It goes without saying that state and local officers could not provide meaningful cooperation in the apprehension, detention, and ultimate removal of criminal aliens without some power to make arrests.

Although §1357(g)(10) contemplates state and local authority to apprehend criminal aliens for the purpose of removal, the Court rejects out of hand any possibility that officers could exercise that authority without federal direction. Despite acknowledging that there is "ambiguity as to what constitutes cooperation," the Court says that "no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Ante,* at 18. The Court adopts an unnecessarily stunted view of cooperation. No one would say that a state or local officer has failed to cooperate by making an on-the-spot arrest to enforce federal law. Unsolicited aid is not necessarily uncooperative.

To be sure, were an officer to persist in making an arrest that the officer knows is unwanted, such conduct would not count as cooperation. But nothing in the relevant federal statutes suggests that Congress does not want aliens who have committed removable offenses to be arrested.[2] To the contrary, §1226(c)(1) commands that the Executive "shall take into custody any alien" who is deportable for having committed a specified offense. And §1226(c)(2) substantially limits the circumstances under which the Executive has discretion to release aliens held in custody under paragraph (1). So if an officer arrests an alien who is removable for having committed one of the crimes listed in §1226(c)(1), the Federal Government is

---

[2] That goes for the Executive Branch as well, which has made the apprehension and removal of criminal aliens a priority. See App. 108.

obligated to take the alien into custody.

That Congress generally requires the Executive to take custody of criminal aliens casts considerable doubt on the Court's concern that §6 is an obstacle to the Federal Government's exercise of discretion. The Court claims that the authority conferred by §6 "could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case" and that this "would allow the State to achieve its own immigration policy," resulting in the "unnecessary harassment of some aliens . . . whom federal officials determine should not be removed." *Ante,* at 17. But §1226(c)(1) belies the Court's fear. In many, if not most, cases involving aliens who are removable for having committed criminal offenses, Congress has left the Executive no discretion but to take the alien into custody. State and local officers do not frustrate the removal process by arresting criminal aliens. The Executive retains complete discretion over whether those aliens are ultimately removed. And once the Federal Government makes a determination that a particular criminal alien will not be removed, then Arizona officers are presumably no longer authorized under §6 to arrest the alien.

To be sure, not all offenses for which officers have authority to arrest under §6 are covered by §1226(c)(1). As for aliens who have committed those offenses, Congress has given the Executive discretion under §1226(a) over whether to arrest and detain them pending a decision on removal. But the mere fact that the Executive has enforcement discretion cannot mean that the exercise of state police powers in support of federal law is automatically pre-empted. If that were true, then state and local officers could never make arrests to enforce any federal statute because the Executive always has at least some general discretion over the enforcement of federal law as a practical matter. But even assuming that the express

statutory grant of discretion in §1226(a) somehow indicates a congressional desire to pre-empt unilateral state and local authority to arrest criminal aliens covered by that provision, §6 is not pre-empted on its face given its substantial overlap with §1226(c)(1).

It bears emphasizing that §6 does not mandate the warrantless apprehension of all aliens who have committed crimes for which they are removable. Instead, it only grants state and local officers permission to make such arrests. The trouble with this premature, facial challenge is that it affords Arizona no opportunity to implement its law in a way that would avoid any potential conflicts with federal law. For example, Arizona could promulgate guidelines or regulations limiting the arrest authority conferred by §6 to the crimes specified in §1226(c)(1). And to the extent §1226(c)(1) is unclear about which exact crimes are covered,[3] Arizona could go even further and identify specific crimes for which there is no doubt an alien would be removable. The point is that there are plenty of permissible applications of §6, and the Court should not invalidate the statute at this point without at least some indication that Arizona has implemented it in a manner at odds with Congress' clear and manifest intent. We have said that a facial challenge to a statute is "the most difficult challenge to mount successfully" because "the challenger must establish that no set of circumstances exists under which the [statute] would be valid." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987); see also *Anderson* v. *Edwards*, 514 U. S. 143, 155, n. 6 (1995) (applying the *Salerno* standard in a pre-emption case). As to §6, I do not believe the United States has carried that

———————

[3] I readily admit that it can be difficult to determine whether a particular conviction will necessarily make an alien removable. See *Padilla* v. *Kentucky*, 559 U. S. \_\_\_, \_\_\_ (2010) (ALITO, J., concurring in judgment) (slip op., at 4).

heavy burden.

## B

Finally, the Court tells us that §6 conflicts with federal law because it provides state and local officers with "even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers." *Ante,* at 16–17. The Court points to 8 U. S. C. §1357(a)(2), which empowers "authorized" officers and employees of ICE to make arrests without a federal warrant if "the alien so arrested is in the United States in violation of any [immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest." Because §6 would allow Arizona officers to make arrests "regardless of whether a federal warrant has issued or the alien is likely to escape," *ante,* at 17, the Court concludes that §6 is an obstacle to the accomplishment of Congress' objectives. But §6 is an obstacle only to the extent it conflicts with Congress' clear and manifest intent to preclude state and local officers from making arrests except where a federal warrant has issued or the arrestee is likely to escape. By granting warrantless arrest authority to *federal officers*, Congress has not manifested an unmistakable intent to strip *state and local officers* of their warrantless arrest authority under state law.

Likewise, limitations on federal arrest authority do not mean that the arrest authority of state and local officers must be similarly limited. Our opinion in *Miller,* 357 U. S. 301, is instructive. In that case, a District of Columbia officer, accompanied by a federal officer, made an arrest based on a suspected federal narcotics offense. *Id.,* at 303–304. The federal officer did not have statutory authorization to arrest without a warrant, but the local officer did. *Id.,* at 305. We held that District of Columbia law dictated the lawfulness of the arrest. *Id.,* at 305–306.

Where a state or local officer makes a warrantless arrest to enforce federal law, we said that "the lawfulness of the arrest without warrant is to be determined by reference to state law." *Id.,* at 305. Under §6, an Arizona officer may be authorized to make an arrest that a federal officer may not be authorized to make under §1357(a)(2). As *Miller* makes clear, that fact alone does not render arrests by state or local officers pursuant to §6 unlawful. Nor does it manifest a clear congressional intent to displace the exercise of state police powers that are brought to bear in aid of federal law.