*979 BERZON, Circuit Judge,
Concurring in light of the Dissent from the denial of rehearing en Banc:
I join the panel opinion in full. I write in concurrence to further explain our holding in light of the dissent from denial of rehearing en banc.
I write first to emphasize that the “law” that has preemptive power over Arizona’s policy is Congress’ conferral of exclusive authority on the executive branch to defer removal of individuals who lack legal status and to authorize them to work while temporarily permitted to remain. Furthermore, I write to highlight that the preemption issues ultimately decided in this case can be viewed as embedded in the equal protection analysis, given the historical and conceptual overlap between equal protection and preemption concerns in cases involving state laws that affect immigrants. The serious equal protection concerns raised by Arizona’s policy bolster our preemption holding, which was reached in a careful exercise of the principle of constitutional avoidance.
I.
As the panel opinion makes clear, it is the authority specifically conferred on the Attorney General by the Immigration and Nationality Act (“INA”), 8 U.S.C. § 1101 et seq., and the associated regulations, that is the body of federal law that preempts Arizona’s policy, not any particular exercise of executive authority. The INA, as implemented by authorized regulations, affirmatively permits the Attorney General to decide whether undocumented immigrants should be removed from the country and when, and also whether they should be authorized to stay and to work if they are not to be immediately removed. Contrary to the Dissent from the denial of rehearing en banc (“Dissent”), this conferral of authority is not limited to “only two small provisions of the INA.” Dissent at 959. See e.g., 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (indicating that certain visa applicants are “eligible for deferred action and work authorization”); id. § 1182(a)(9)(B)(ii) (providing that for purposes of determining inadmissibility, unlawful presence includes any time an alien “is present in the United States after the expiration of the period of stay authorized by the Attorney General”); id. § 1227(d)(2) (indicating that certain visa applicants who are denied an administrative stay of removal can apply for “a stay of removal, deferred action, or a continuance or abeyance of removal proceedings”); id. § 1229b (giving the Attorney General the discretion to cancel removal for certain inadmissable or removable aliens, including those who were never lawfully admitted); id. § 1324a(h)(3) (defining an “unauthorized alien” for purposes of employment as an alien who is neither “lawfully admitted for permanent residence” nor “authorized to be so employed by [statute] or by the Attorney General”); REAL ID Act of 2005, Pub. L. No. 109-13, div. B, § 202(c)(2)(B)(viii), (C)(ii), 119 Stat. 231, 313 (indicating that persons with “approved deferred action status” are present in the United States during a “period of authorized stay” for purposes of issuing state drivers’ licenses and identification cards); 8 C.F.R. § 274a.12(c)(14) (indicating that an “alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority” may be granted work authorization upon application and a showing of economic necessity).
These various provisions, among others, make clear that Congress has expressly authorized the Attorney General, at his discretion, officially to defer removal of individuals who lack legal status, thereby temporarily authorizing their stay, and to authorize such individuals to work while *980 temporarily permitted to remain.[1] See Arizona v. United States, 567 U.S. 387, 132 S.Ct. 2492, 2506, 183 L.Ed.2d 351 (2012) (“[T]he removal process is entrusted to the discretion of the Federal Government.”).
The Attorney General granted the plaintiffs in this case deferred action and furnished them with federal employment authorization documents.[2] Arizona’s denial of drivers’ licenses to DACA recipients rests on the premise that their presence is not “authorized under federal law,” even though the federal government has decided otherwise, exercising the powers delegated to it by Congress. Arizona has, therefore, intruded into an area of deci-sionmaking entrusted to the federal government.[3]
II.
Critically, our preemption holding reflects a careful exercise of constitutional avoidance, based on the serious equal protection concerns raised by Arizona’s policy. Although we rest our decision on preemption grounds, the preemption and equal protection concerns raised in this case are overlapping rather than distinct. And because that is so, I am convinced that although we wisely did not decide the equal protection issue, were it necessary to decide the question I would have held that there was an equal protection violation.
Equal protection and preemption concerns have long been intertwined in cases dealing with state laws that classify immigrants. See Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); Nyquist v. Mauclet, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Takahashi, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478; Truax, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131; see also Jenny-Brooke Condon, The Preempting of Equal Protection for Immigrants?, 73 Wash. & Lee L. Rev. 77 (2016); David F. Levi, Note, The Equal Treatment of Aliens: Preemption or Equal Protection?, 31 Stan. L. Rev. 1069 (1979).
For example, in Nyquist v. Mauclet, the state asserted that one of its goals in *981 excluding certain classes of aliens from eligibility for in-state tuition was to provide incentives for aliens to naturalize. 432 U.S. at 9-10, 97 S.Ct. 2120. In holding the state law violated the Equal Protection Clause, the Court found that state purpose “not a permissible one for a State” because “[c]ontrol over immigration and naturalization is entrusted exclusively to the Federal Government, and a State has no power to interfere.” Id. at 10, 97 S.Ct. 2120. Similarly in Graham v. Richardson, another decision that rested on equal protection grounds, the Court provided that “[sjtate alien residency requirements that either deny welfare benefits to noncitizens or condition them on longtime residency, equate with the assertion of a [state] right, inconsistent with federal policy, to deny entrance and abode. Since such laws encroach upon exclusive federal power, they are constitutionally impermissible.” 403 U.S. at 380, 91 S.Ct. 1848. Takahashi v. Fish and Game Commission likewise held that “[s]tate laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with [the] constitutionally derived federal power to regulate immigration.” 334 U.S. at 419, 68 S.Ct. 1138.
The overlap evident in these cases between the equal protection and preemption analyses where state laws that affect immigrants are at issue is no accident. As the equal protection analysis in the panel opinion illustrates, both the “similarly situated” and “legitimate state interest” inquiries required for equal protection analysis necessarily incorporate recognition of the preeminent, although not exclusive, federal role in immigration matters, the same role distribution emphasized in immigration preemption cases.[4]
A.
The primacy of federal immigration law first informs the equal protection analysis when we are determining whether the groups being classified are “similarly situated.” As the panel opinion states, the Equal Protection Clause prevents the government from “treating differently persons who are in all relevant respects alike.” Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (emphasis added). “Relevant respects” are only those respects that relate to the goals of the challenged state law.
Classifications adopted by states “must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.” Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)). Accordingly, to adopt a federal immigration classification “as a criterion for its own discriminatory policy, the State must demonstrate that the classification is reasonably adapted to the purposes for which the state desires to use it.” Plyler, 457 U.S. at 226, 102 S.Ct. 2382 (internal quotation marks and citations omitted) (emphasis in original). Those purposes do not properly include making decisions about who should remain in this country, who should be removed, or what are the conditions of stay for those temporarily authorized to be here.
*982 For example, in Gmha/m v. Richardson, the Court struck down on equal protection grounds a state law that denied welfare benefits to non-citizens whom the Court found similarly situated in all respects relevant to the state welfare law: non-citizens paid taxes, could be called into the armed forces, and worked in the state, thereby contributing to the state’s economic welfare. 403 U.S. at 376, 91 S.Ct. 1848. The groups of residents were “indistinguishable except with respect to whether they are or are not citizens of this country.” Id. at 371, 91 S.Ct. 1848. The two groups were not, of course, similarly situated in the latter respect — that is, as to whether they were citizens. And that difference entailed many embedded distinctions between the non-citizens and citizens, including the right to vote, to serve on juries, and to remain in the country even if engaged in criminal activities. But the citizen/non-citizen distinction was the one that the state had to justify, not a basis for declaring the two groups not similarly situated with regard to receiving welfare benefits.
Similarly, the immigration-related distinction between the plaintiffs and other undocumented immigrants has no role in this case at the “similarly situated” juncture.[5] Rather, the pertinent comparisons at this stage concern the other requirements for obtaining drivers’ licenses — -Are the applicants old enough? Can they pass the written test? Can they pass the driving test? Have they violated driving laws in the past, as by driving without a license or while drunk? The immigration-related classification is the one the state must justify at the next stage of equal protection analysis, not the measure of whether the plaintiffs are otherwise similarly situated with regard to obtaining drivers’ licenses.
B.
Preemption themes next surface in the equal protection analysis in the examination of legitimate state interests. A state interest is only legitimate for equal protection purposes when it lies within an area of concern within the state’s authority. When the state law touches on immigration, the ambit of legitimate state concern is constrained by the federal government’s preeminent power directly to regulate immigration — that is, to decide who will be admitted, who may remain, and who will be removed.
As stated in Plyler v. Doe, “[although it is a routine and normally legitimate part of the business of the Federal Government to classify on the basis of alien status and to take into account the character of the relationship between the alien and this country, only rarely are such matters relevant to legislation by a State.” 457 U.S. at 225, 102 S.Ct. 2382 (internal quotation marks and citations omitted). Consistently with this view, Mathews v. Diaz explained that “a division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification, whereas, a comparable classification by the Federal Government is a routine and normally legitimate part of its business.” 426 U.S. 67, 85, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).
For this reason, the Supreme Court has long recognized that federal power over immigration constrains a state’s legitimate interests in classifying groups of immigrants differently from one another and then disadvantaging one of the groups so classified. In Truax v. Raich, 239 U.S. at 42, 36 S.Ct. 7, for example, the Court *983 admonished that “reasonable classification implies action consistent with the legitimate interests of the state, and it will not be disputed that these cannot be so broadly conceived as to bring them into hostility to exclusive Federal power.” Truax involved an equal protection challenge, by an alien lawfully admitted into the United States, to an Arizona law that required certain employers to hire a majority of workers who were qualified electors or native-born United States citizens. Id. at 40, 36 S.Ct. 7. Truax rejected the argument that the state’s prioritization of citizens for employment was justified by the state’s power “to make reasonable classifications in legislating to promote the health, safety, morals, and welfare of those within its jurisdiction,” because the state lacked “the authority to deal with that at which the legislation is aimed.” Id. at 41, 43, 36 S.Ct. 7; see also Takahashi, 334 U.S. at 420, 68 S.Ct. 1138 (noting the “tenuousness of the state’s claim that it has power to single out and ban its lawful alien inhabitants ... from following a vocation simply because Congress has put some groups in special classifications in exercise of its broad and wholly distinguishable powers over immigration and naturalization.”).
States assuredly do have authority to regulate employment, just as they have authority to regulate the distribution of drivers’ licenses. The state authority lacking in Truax, and here, is the authority to justify discrimination as to areas within state power on grounds that are beyond state authority because exclusively within the authority of the federal government.
For these reasons, equal protection analysis with regard to state laws, like Arizona’s, that disadvantage some aliens compared with others necessarily incorporates distribution-of-authority concerns that directly parallel those encountered in preemption analyses. It is in light of this overlap between preemption and equal protection analyses in the immigration context that the panel’s equal protection analysis evaluated the proffered state interests said rationally to justify the denial of drivers’ licenses to the plaintiffs. And it is in this light that we rejected any state justification for the classification in state law that suggested an intent to preclude or discourage the plaintiffs from remaining and working even though the federal government allowed them to do so. For the same reason, we rejected any justification that turned on immigration status distinctions with no connection to state-drivers’-lieense-related concerns (such as the distinction between aliens holding work authorization while in removal proceedings and DACA recipients holding work authorization but not in the process of being removed). Amended op. at 968-69, 970, 972. We then concluded that the remaining rationales Arizona provided simply are not reasonable. Amended op. at 968-70.
In short, the preeminent federal role in immigration matters thus not only underlies our ultimate preemption holding, but also directly informs the equal protection analysis. Given the constraints on a state’s legitimate interests in classifying groups of immigrants, we could, in my view, have rested our rejection of the challenged Arizona statute simply on a rational basis equal protection analysis (without reaching the question whether a more stringent standard of review applies). Were it necessary to reach the question, I would have held Arizona’s application of its drivers’ license statute invalid as a denial of equal protection to DACA recipients, as compared to other undocumented individuals to whom Arizona does provide drivers’ licenses. See Amended op. at 968-71.
The Dissent brushes past these equal protection concerns, regarding them as an “excursus,” and even suggesting that over a century of equal protection jurispru *984 dence regarding state immigration regulations, beginning with Truax in 1915, be overturned. Dissent at 980 n.l, 982 n.5
But the panel’s methodology' — -a careful analysis of the strength of a constitutional challenge, before turning to an alternative that avoids definitely deciding that constitutional question — is one with a long pedigree, grounded in judicial restraint. See, e.g., Zadvydas v. Davis, 533 U.S. 678, 690-96, 699, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001); Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council, 485 U.S. 568, 575-78, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988).[6] To criticize the panel’s preemption analysis in a vacuum, with little recognition of the constitutional avoidance rationale underlying it, is tantamount to lopping off the first five floors of a ten story building and then declaring that the building, thus truncated, is unstable.
Again, I concur fully in the panel opinion. In addition, in my view, as we held in the preliminary injunction appeal, Arizona Dream Act Coalition v. Brewer, 757 F.3d 1053, 1067 (9th Cir. 2014), and as the district court held as the basis for the final injunction, Arizona Dream Act Coalition v. Brewer, 81 F.Supp.3d 795, 808 (D. Ariz. 2015), the equal protection challenge is independently valid and, if we needed to reach it, would justify our conclusion that Arizona’s denial of drivers’ licenses to DACA recipients cannot stand.

. Authorizing someone to work in the country is necessarily to authorize their presence. The Supreme Court, in Takahashi v. Fish & Game Commission, 334 U.S. 410, 416, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), stated that "[t]he assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the state would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work.” (quoting Truax v. Raich, 239 U.S. 33, 42, 36 S.Ct. 7, 60 L.Ed. 131 (1915)). The obverse is also true: Authorizing an alien to work in the country is necessarily authorizing him to remain.

. I note that the Dissent at points treats this case as parallel to Texas v. United States, 809 F.3d 134 (5th Cir. 2015), aff'd by an equally divided court, - U.S. -, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (per curiam). It decidedly is not. Arizona raised in the district court no affirmative challenge to the Deferred Action for Childhood Arrivals ("DACA”) program, whether based on administrative law concepts or the scope of the executive's responsibility to enforce federal laws. Compare id. at 149. (Arizona is a plaintiff in the Texas v. United States litigation, which does raise such issues and is ongoing.). Instead, Arizona has asserted the authority to treat some undocumented individuals with deferred status and federal work authorization differently from others with the same federal dispensations. It is the validity of that differential treatment that is at the heart of this case.

.Arizona's driver's license statute turns upon whether an immigrant's presence is "authorized under federal law” not whether the presence is "lawful” in the sense of specifically condoned by statute. See Ariz. Rev. Stat. Ann. § 28-3153(D). If the statute turned on the latter, Arizona could not, as it does, issue licenses to many undocumented individuals who do not have lawful status but have been granted work authorization while in removal proceedings. See Amended op. 968.

. Because preemption concerns are embedded in and addressed by equal protection decisions regarding state laws that affect immigrants, equal protection decisions like Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786, are relevant to our preemption holding. See Condon, supra pp. 5, at 83 ("[T]he Supreme Court has reinforced the principle that the federal government has exclusive responsibility for the regulation of immigration, as much through its equal protection jurisprudence as it has through preemption decisions.”).

. The panel opinion makes this basic point, briefly. Amended op. at 966-67. It then goes on for completeness to answer the state's similarly situated argument on its own terms, which stressed immigration status differences between the plaintiffs and other aliens. Amended op. at 966-68.

. This court has observed that DeBartolo reached a statutory holding only "[a]fter considering at some length, but not deciding, the [constitutional] arguments.” Overstreet v. United. Bhd. of Carpenters & Joiners of Am., Local Union No. 1506, 409 F.3d 1199, 1209 (9th Cir. 2005).